MANAGEMENT RECRUITERS OF O'HARE, INC., Plaintiff-Appellant, v. PROCESS AND ENVIRONMENTAL EQUIPMENT UNLIMITED, INC., Defendant-Appellee.

Second District   No. 2—84—0825

Opinion filed October 8, 1985.

Patrick L. Heaslip and John L. Heaslip, both of Clark & Heaslip, of Rockford, for appellant.

Randall K. Reese, of Reese, Reese & Bagley, of Rockford, for appellee.

JUSTICE SCHNAKE delivered the opinion of the court:
Plaintiff, Management Recruiters of O'Hare, Inc. (Management

Recruiters), brought this action against defendant, Process and Environmental Equipment Unlimited, Inc. (Equipment Unlimited), to recover a fee for its services in finding a salesman who ultimately became associated with Equipment Unlimited. The complaint alleged that Equipment Unlimited owed the fee pursuant to an oral agreement with Management Recruiters. In its answer Equipment Unlimited denied the allegations regarding breach of contract. It also alleged, as an affirmative defense, that Management Recruiters was barred from recovering its fee because it was not licensed under "An Act to revise the law in relation to private employment agencies ***" (the Private Employment Agencies Act) (Ill. Rev. Stat. 1983, ch. 111, par. 901 *et seq.*). The matter proceeded to a bench trial. Following presentation of all the evidence, the court found that under the Act Management Recruiters was not required to be licensed, but that Equipment Unlimited had not entered into a contract with Management Recruiters. Accordingly, judgment was entered in favor of defendant Equipment Unlimited.

Management Recruiters appeals, contending that the trial court's finding that there was no contract was against the manifest weight of the evidence. In defense of the judgment, Equipment Unlimited again raises its contention that Management Recruiters is barred from recovering its fee because it was not licensed under the Act. Equipment Unlimited maintains that the trial court's finding on this issue was contrary to the manifest weight of the evidence.

Before reviewing the facts of this case, it will be helpful to set out the provisions of the Private Employment Agencies Act which were the basis of the affirmative defense. Section 1 of the Act requires employment agencies to procure a license to operate from the Department of Labor. It requires them to file a schedule of fees with the department, and provides that "[i]t shall be unlawful for any employment agency to collect or attempt to collect any compensation for any service not specified in the schedule of fees filed with the department." (Ill. Rev. Stat. 1983, ch. 111, par. 901.) The term "employment agency" is defined in section 11 of the Act as follows:

> "[A]ny person engaged for gain or profit in the business of securing or attempting to secure employment for persons seeking employment or employees for employers. However, the term 'employment agency' shall not include any person engaged in the business of management consulting or management executive recruiting, and who in the course of such business is retained by, acts solely on behalf of, and is compensated solely by, an employer to identify, appraise or recommend an individual

or individuals for consideration *for an executive or professional position,* provided that: (a) the compensation for each such position is at the rate of not less than $15,000 per year; and (b) in no instance is the individual who is identified, appraised or recommended for consideration for such position charged a fee directly or indirectly in connection with such identification, appraisal or recommendation, or for preparation of any resume, or on account of any other personal service performed by the person engaged in the business of management consulting or management executive recruiting." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 111, par. 914.

At the bench trial plaintiff Management Recruiters called three witnesses on its behalf: Richard Kurz, the president of Management Recruiters, and George Crull and Richard Stafford, former account executives of the firm. Plaintiff also called Richard Ryan, the president of Equipment Unlimited, under section 2—1102 of the Code of Civil Procedure. Ill. Rev. Stat. 1983, ch. 110, par. 2—1102.

Kurz testified that Management Recruiters was an executive search firm located in Des Plaines. It was in the business of finding key people for client companies. In all cases the fee for such service was paid by the client companies. Kurz stated that Management Recruiters always worked on behalf of the employer, not the prospective employee. When asked whether there were any type of jobs in which Management Recruiters did not place people, Kurz replied, "We don't deal below [$]25,000." He acknowledged that the firm was not licensed as an employment agency "pursuant to Illinois state statute," and that it had not filed a fee schedule with the State of Illinois.

Kurz testified that as a placement fee, Management Recruiters charged from 25% of the estimated annual compensation of the employee if such compensation was $25,000, up to 30% if the compensation was $30,000 or above. The fee was payable if the employee was hired.

Crull testified that on March 20, 1980, he placed a telephone call to Ryan, the president of Equipment Unlimited, and asked him whether he needed anyone for a sales position. Ryan told Crull that he did have an opening for a salesman. Crull filled out a job order regarding the sales position with Equipment Unlimited which listed the salary as $25,000 to $30,000. The job order was admitted into evidence. Crull testified that he discussed payment of the placement fee with Ryan and told him that Equipment Unlimited would be responsible for payment. Crull said that it was his practice "to cover the fee schedule [with the client company], to quote the figures based on the

\*\*\* anticipated compensation package." He acknowledged that he did not send Ryan a copy of the fee schedule, and that he had no subsequent contact with Ryan and did not know whether the sales position was ever filled.

Stafford testified that when he worked for Management Recruiters, he looked for personnel primarily in the sales field. After finding the job order which Crull had filled out, Stafford telephoned Ryan on June 1, 1982. He told Ryan that he knew someone who had a background that Ryan might be interested in. Ryan indicated that he was interested. Stafford testified that he apprised Ryan of the fee schedule, and that when he outlined the prospective employee's requirements, Ryan stated that there would be no problem paying the fee. When Stafford was asked whether Ryan and he reached a definite agreement as to the amount of the fee, Stafford testified that they reached an agreement as to the percentage of the anticipated compensation. When asked whether Ryan and he reached an agreement regarding anticipated compensation, Stafford replied, "[H]e would not give me an exact amount. It varied."

Following his conversation with Ryan, Stafford telephoned James Stanton, the prospective employee, and apprised him of the possibility of a job with Equipment Unlimited. Because Stanton had question about the equipment he would be selling, Stafford instructed him to call Ryan, and then to let him (Stafford) know what had occurred.

Stafford testified that later that same day he sent a letter to Ryan, along with a copy of the fee schedule. Stafford stated that he believed he sent a copy of Stanton's resume along with the letter. A copy of the letter was admitted into evidence. In the letter Stafford thanked Ryan for taking the time to discuss Stanton, and informed Ryan that Stanton would be contacting him. The letter also provided, "Our fee schedule is attached, which will confirm our phone conversation."

Stafford testified that sometime later he contacted Ryan to see if Stanton had been in touch with him. Stafford subsequently sent Ryan a letter dated June 22, 1982, which was admitted into evidence. That letter purported to summarize what had occurred between Stafford and Ryan up to that point. It stated that in the initial telephone conversation Ryan had told Stafford that "the person in the job should earn $35,000 annually." The letter further stated, "The billing on $35,000 realistic first year earnings is 30% or a total of $10,500 payable within 10 days after he [Stanton] begins employment. If you cannot see your way clear to paying our fee, I would suggest you break off discussions with Mr. Stanton."

Stafford received a letter from Ryan in response, dated June 29, 1982, which was admitted into evidence. In this letter Ryan gave his version of what had occurred up to that point. In the course of that summary, Ryan acknowledged that on the day he was to meet with Stanton, Stafford telephoned him (Ryan) and attempted to explain the fee schedule, "stating something to the effect that your fee would be approximately $10,000 if Jim's salary was approximately $30,000/ year—a figure you thought he would accept." The letter went on to state that Ryan had told Stafford he had no intention of paying "such an exorbitant fee."

Stafford wrote a letter, dated July 1, 1982, which, along with a copy of the fee schedule, he sent Ryan in response. The letter was admitted into evidence. In relevant part it stated, "I have taken the liberty of sending along another copy [of the fee schedule]. Please understand that should you hire Mr. Stanton we will invoice in accordance with that schedule ***."

Finally, Stafford testified that during one of his conversations with Ryan, the latter asked him if Stanton would accept $30,000, and Stafford replied that he would.

Ryan testified that he did not recall having any conversation with Crull in March of 1980.

Ryan gave his version of his June 1 telephone conversation with Stafford. According to Ryan, Stafford called him and inquired regarding his interest in Stanton. Ryan responded that he did not have a position available with his company. Stafford then told Ryan that he had a very promising candidate that he would like Ryan to talk to. Ryan insisted that Stafford send Stanton's resume first. Stafford said he would. According to Ryan, there was no discussion about fee schedules, or who would be responsible for payment.

Ryan testified that, "to [his] recollection," he never received Stafford's letter of June 1, with an enclosed fee schedule.

Ryan testified that he did subsequently meet with Stanton. Ryan did not receive a copy of Stanton's resume until Stanton brought one to the meeting. A copy of the resume was introduced into evidence. On the day of the meeting but prior to it, Stafford telephoned Ryan. Ryan stated that he again advised Stafford that he did not have an employee position available. Ryan told Stafford that he was going to meet with Stanton at the latter's request, and that Stanton had set up his own appointment. Ryan also informed Stafford that he had not received a fee schedule. Finally, Ryan told Stafford that the employees at Equipment Unlimited were commissioned salesmen who could be expected to earn any quantity of money. Ryan told Stafford that it

was his (Ryan's) hope that they could earn in the range of $25,000 to $35,000 per year.

When he met with Stanton, Ryan told him that he did not have a position available "as an employed, salaried person." Stanton then suggested that he become associated with Equipment Unlimited as an independent contractor.

Ryan testified that he recalled receiving Stafford's June 22 letter, and Ryan identified the letter he wrote in response. Ryan also received Stafford's July 1 letter, accompanied by a copy of the fee schedule.

Ryan also testified that subsequently, on July 17, 1982, he entered into a written "subagency" agreement with Stanton. The agreement was admitted into evidence. Under this agreement Stanton was not an employee, but an independent contractor. Stanton was to diligently attempt to sell water and waste water treatment equipment made by manufacturers represented by Equipment Unlimited. He was entitled to commissions on the sales made, but no salary or other benefits.

Ryan further stated that after execution of the subagency agreement, Stanton did not play a decision-making role in Equipment Unlimited, and he had no control over its employees. When asked what technical expertise or training was required for the position of salesman, Ryan replied, "Basically a need to be able to read and write." He said the salesman did not have to be an engineer, and that a college degree was not required. Ryan testified that the personality of the salesman was an important consideration.

It was based on the evidence recounted above that the trial judge concluded that Management Recruiters was not precluded from recovering its fee by the Private Employment Agencies Act, but that it was not entitled to the fee because there was no contract. With respect to the statutory question, the trial judge concluded that Management Recruiters was not an "employment agency" as that term is defined in the Act because it fell within the exception for a person "engaged in the business of *** management executive recruiting, and who in the course of such business is retained by, acts solely on behalf of, and is compensated solely by, an employer to identify *** individuals for consideration for an executive or professional position." Said the judge:

> "Now, in order to look for executives they [Management Recruiters] must, in my opinion, qualify in that they are providing for consideration to the defendant an executive or professional ***. They did not, I find, supply an executive for the defendant. They did, in my mind, find a professional ***, and I come

to the conclusion that this man, *** James Stanton, was a professional, in that he had expertise in certain areas of the field in which Mr. Ryan's company, which is the defendant, was engaged in. That is water treatment, so on. He was not an amateur as opposed to a professional. He was not just a salesman who sold hardware or sold cars or sold paint. He was a professional."

Because Management Recruiters was not acting as an employment agency, the trial judge concluded, it was not required to be licensed in order to recover its fee. With respect to his decision that there was no contract, the trial judge explained, "I feel at no time did they [Stafford and Ryan] arrive at the fee that Mr. Ryan was to pay on behalf of the defendant."

We first consider the issue regarding the Private Employment Agencies Act. Equipment Unlimited maintains that Management Recruiters was acting as an "employment agency" as that term is defined in the Act. It did not fall into the exception regarding "management executive recruiting" firms because the position it sought to fill for Equipment Unlimited was neither an "executive" nor a "professional" position. Equipment Unlimited cites *Zinn v. Parrish* (N.D. Ill. 1977), 461 F. Supp. 11, to support its contention that the failure of Management Recruiters to comply with the Act's licensing requirements bars it from recovering its fee.

In response, Management Recruiters advances only one argument. It notes that this issue was decided against Equipment Unlimited in the trial court and maintains that the failure of Equipment Unlimited to file a cross-appeal precludes it from raising the issue on appeal. In support of that argument, Management Recruiters cites *Cleys v. Village of Palatine* (1980), 89 Ill. App. 3d 630, 635, 411 N.E.2d 1161, for the principle that "where a general decision for the appellee contains a specific finding unfavorable to him and he fails to file a cross-appeal, the adverse finding is not properly before the reviewing court."

■ Management Recruiters is incorrect when it maintains that Equipment Unlimited, the appellee, may not raise this issue. In *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, our supreme court rejected a similar contention, stating:

> "It is the judgment and not what else may have been said by the lower court that is on appeal to a court of review. [Citations.] The reviewing court is not bound to accept the reasons given by the trial court for its judgment [citation], and the judgment may be sustained upon any ground warranted, re-

gardless of whether it was relied on by the trial court and regardless of whether the reason given by the trial court was correct. [Citations.] Findings of the trial court adverse to the appellee do not require the appellee's cross-appeal if the judgment of the trial court was not at least in part against the appellee."

The court explained that the principle stated in *Cleys* is applicable only where part of the judgment is adverse to the appellee. Here, the judgment of the trial court was completely in favor of the appellee, and, therefore, the appellee was not required to file a cross-appeal to seek to defend the judgment in its favor with its argument based on the Private Employment Agencies Act.

The *Zinn* decision cited by Equipment Unlimited did hold that the failure of an employment agency to be licensed under the Act "results in an unenforceable and void contract under Illinois law." (461 F. Supp. 11, 13.) The precedential value of the *Zinn* decision is, however, somewhat limited because it was reversed and the cause remanded in an unpublished opinion. (*Zinn v. Parrish* (7th Cir. 1978), 582 F.2d 1282.) On remand the district court reassessed its position and determined that the plaintiff in that case was not an employment agency subject to the licensing requirements of the Act, and that determination ws upheld on appeal. (*Zinn v. Parrish* (7th Cir. 1981), 644 F.2d 360.) The authorities cited by the district court in the first *Zinn* decision, however, support its conclusion that the failure of an employment agency to become licensed under the Act bars it from recovering its fee.

The district court first cited *Tovar v. Paxton Community Memorial Hospital* (1975), 29 Ill. App. 3d 218, 330 N.E.2d 247, in which an unlicensed physician was held to be barred from maintaining a cause of action for breach of his employment contract. The court noted that the purpose of the statutes establishing a licensing requirement is not to generate revenue, but to protect the public, and stated that any agreement "the purpose of which is to induce a breach of one of these licensing statutes is illegal." (29 Ill. App. 3d 218, 220.) The court stated that an unlicensed physician could not maintain an action for his fee on contract or in *quantum meruit*.

The district court in *Zinn* also cited *Winston v. Kaspar American State Bank* (1962), 36 Ill. App. 2d 423, 184 N.E.2d 725, in which a real estate broker was held to be precluded from enforcing his contract for commission because he was not licensed pursuant to an applicable city ordinance. The ordinance provided, in part, "No person shall pay any commission or other compensation to any person for negotiating contracts of real estate other than to real estate brokers li-

censed under this chapter." (36 Ill. App. 2d 423, 427.) The court in *Winston* noted that in *Usher v. McGowan* (1958), 20 Ill. App. 2d 201, 155 N.E.2d 830, it had been held that the above language showed that the intention of the city council in adopting the ordinance was not only to regulate the business by imposing a fine, but also to render contracts for commissions unenforceable.

■ In the instant case, the purpose of the licensing statute, like that in *Tovar*, appears to be primarily the protection of the public. For example, under section 1 an applicant for a license is required to furnish to the Department an affidavit "stating that he has never been a party to any fraud, has no jail or prison record, belongs to no subversive societies, and is of good moral character, is of business integrity and is financially responsible." The application is required to be "accompanied by such evidence of the applicant's business reputation for integrity and such evidence of the applicant's financial responsibility as the Department may by regulation require." (Ill. Rev. Stat. 1983, ch. 111, par. 901.) Under section 12 licenses are required to be revoked or suspended following a hearing at which it has been shown that the agency was "guilty of any immoral, fraudulent or illegal conduct in connection with the conduct of the business." Licenses are permitted to be revoked or suspended "for any good cause shown within the meaning and purpose of this Act." (Ill. Rev. Stat. 1983, ch. 111, par. 915.) Not only is the purpose of this licensing statute to protect the public, but, similar to the ordinance in *Winston*, the licensing law here explicitly makes it unlawful for an employment agency to collect any compensation when it is not licensed. Section 1 provides in relevant part, "It shall be unlawful for any employment agency to collect or attempt to collect any compensation for any service not specified in the schedule of fees filed with the department." (Ill. Rev. Stat. 1983, ch. 111, par. 901.) Under these circumstances, we conclude that an employment agency which is not licensed under the Act may not recover its fee. See also *Management Search, Inc. v. Kinard* (1973), 231 Ga. 26, 199 S.E.2d 899 (contract made by employment agency which fails to become licensed under applicable statute is void and unenforceable).

In the instant case there is no dispute that Management Recruiters was not licensed and had not filed a schedule of fees with the Department of Labor. The Act requires all "employment agencies" as that term is defined therein to be licensed. The resolution of this issue, therefore, turns on whether Management Recruiters was acting as an "employment agency" when it brought Stanton and Equipment Unlimited together. The definition of that term has been set forth

above, and it will not be repeated here. It is apparent from the unambiguous language of the definition that Management Recruiters was acting as an "employment agency" unless it fell within the exception for "management executive recruiting" firms. In order for that to be the case, the employment position with Equipment Unlimited which Management Recruiters sought to fill with Stanton was required to be either an "executive" or a "professional" position. Those terms are not defined in the Act, and a consideration of the ordinary meaning of the words will, therefore, be helpful. See *Paramount Consulting Agency, Inc. v. Johnson* (1979), 75 Ill. App. 3d 749, 394 N.E.2d 672.

The term "executive," aside from its meaning related to the executive branch of government, has been defined as " any person whose function is to administer or manage affairs, as of a corporation, school, etc." (Webster's New World Dictionary 490 (1972).) Clearly, the trial judge properly found that the sales position involved here was not an "executive" position. Ryan testified without contradiction that Stanton did not play a decision-making role in Equipment Unlimited and had no control over its employees.

■ The term "professional" has two definitions which are arguably relevant here. One is "a person who engages in some art, sport, etc. for money, esp. for his livelihood, rather than as a hobby." (Webster's New World Dictionary 1134 (1972).) This definition may have been the one the trial judge had in mind when he stated that Stanton "was not an amateur as opposed to a professional." That definition, however, does not appear to be applicable to the statute under consideration. All employees would be considered "professionals" under that definition, and the term is clearly being used to delimit a certain class of employees. The other definition is "a person practicing a profession." (Webster's New World Dictionary 1134 (1972).) "Profession" is defined as "a vocation or occupation requiring advanced education and training, and involving intellectual skills, as medicine, law, theology, engineering, teaching, etc." (Webster's New World Dictionary 1134 (1972).) In the instant case Ryan testified that the position of salesman did not require a college degree, and that the salesman would not have to be an engineer. He stated that an ability to read and write was required, and that personality was important. This testimony, which was neither contradicted nor inherently improbable, indicates that the position was not a "professional" one. There was no evidence supporting the opposite conclusion. The trial judge's comments indicate that he may have considered Stanton's resume as evidence that the latter was a "professional." It is not clear that the resume supports that view. It shows that Stanton did not have a college

degree, although he had attended college and did have extensive experience in the sale of water and waste water treatment equipment. At one time he held a position as a "Sales and Process Engineer," but the nature of that position is not described. In any event, the exception to the term "employment agency" requires that the "position" be executive or "professional," not the candidate for the position. Because Ryan's unrebutted testimony established that the sales position here was not a "professional" one, the trial judge's conclusion to the contrary is against the manifest weight of the evidence. See *Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 96-97, 473 N.E.2d 548.

Because Management Recruiters was acting as an "employment agency" and was not licensed to do so, it may not recover a placement fee. We need not, therefore, decide whether there was a contract or whether, if it had been licensed, Management Recruiters could recover on a theory of *quantum meruit.*

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

STROUSE and UNVERZAGT, JJ., concur.