Leo M. ZINN, Plaintiff and Counter-Defendant, Appellant,

v.

Lemar PARRISH, Defendant and Counter-Plaintiff, Appellee.

No. 80–1486.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1980.

Decided March 25, 1981.

Rehearing Denied May 20, 1981.

Sarah L. Flosi, Ill. Inst. of Tech/Chgo. Kent College of Law, Chicago, Ill., for plaintiff and counter-defendant, appellant.

John L. Rogers, III, Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for defendant and counter-plaintiff, appellee.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and BARTELS, Senior District Judge.*

BARTELS, Senior District Judge.

This is an appeal in a diversity action by Leo Zinn from a judgment of the District Court for the Northern District of Illinois, Eastern Division, wherein he sought to recover agent fees due him under a personal management contract between him and the defendant Lemar Parrish. In an earlier posture of the case, Parrish prevailed against Zinn on a motion for summary judgment on the ground that the contract was unenforceable because of Zinn's failure to obtain a license under the Illinois Private Employment Agency Act, Ill.Rev.Stat., ch. 48, § 197a et seq. ("the Employment Agency Act"). *Zinn v. Parrish*, 461 F.Supp. 11 (N.D.Ill.1977). This court reversed and remanded, concluding that certain unresolved issues of fact precluded an award of summary judgment. 582 F.2d 1282 (7th Cir. 1978).

On remand, the district court rendered a verdict in Parrish's favor following a bench trial, on the grounds that the contract was

---

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

void for Zinn's failure to register under the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 *et seq.* ("the 1940 Act"), and that Zinn had failed to perform his own obligations under the contract. In this appeal Parrish renews his contention, rejected by the trial court, that the contract was unenforceable under the Employment Agency Act.

## FACTS

For over two decades the appellant Zinn had been engaged in the business of managing professional athletes. He stated that he was a pioneer in bringing to the attention of various pro-football teams the availability of talented players at small black colleges in the South. In the Spring of 1970, Parrish's coach at Lincoln University approached Zinn and informed him that Parrish had been picked by the Cincinnati Bengals in the annual National Football League draft of college seniors, and asked him if he would help Parrish in negotiating the contract.[1] After Zinn contacted Parrish, the latter signed a one-year "Professional Management Contract" with Zinn in the Spring of 1970, pursuant to which Zinn helped Parrish negotiate the terms of his rookie contract with the Bengals, receiving as his commission 10% of Parrish's $16,500 salary. On April 10, 1971 Parrish signed the contract at issue in this case, which differed from the 1970 contract only insofar as it was automatically renewed from year to year unless one of the parties terminated it by 30 days' written notice to the other party. There were no other restrictions placed on the power of either party to terminate the contract.

Under the 1971 contract, Zinn obligated himself to use "reasonable efforts" to procure pro-football employment for Parrish, and, at Parrish's request, to "act" in furtherance of Parrish's interest by: a) negotiating job contracts; b) furnishing advice on business investments; c) securing professional tax advice at no added cost; and d) obtaining endorsement contracts. It was further provided that Zinn's services would include, "at my request—efforts to secure for me gainful off-season employment," for which Zinn would receive no additional compensation, "unless such employment [was] in the line of endorsements, marketing and the like," in which case Zinn would receive a 10% commission on the gross amount. If Parrish failed to pay Zinn amounts due under the contract, Parrish authorized "the club or clubs that are obligated to pay me to pay to you instead all monies and other considerations due me from which you can deduct your 10% and any other monies due you . . . ."

Over the course of Parrish's tenure with the Bengals, Zinn negotiated base salaries for him of $18,500 in 1971; $27,000 in 1972; $35,000 in 1973 (plus a $6,500 signing bonus); and a $250,000 series of contracts covering the four seasons commencing in 1974 (plus a $30,000 signing bonus). The 1974–77 contracts with the Bengals were signed at a time when efforts were being made by the newly-formed World Football League to persuade players in the NFL to "jump" to the WFL to play on one of its teams. By the end of 1973 season Parrish had become recognized as one of the more valuable players in the NFL. He was twice selected for the Pro Bowl game, and named by Sporting News as one of the best cornerbacks in the league. Towards the end of the 1973 season, the Bengals approached Parrish with an offer of better contract terms than he had earlier been receiving. By way of exploring alternatives in the WFL, Zinn entered into preliminary discussions with the Jacksonville Sharks in early 1974, but decided not to pursue the matter once he ascertained that the Sharks were in a shaky financial position. In retrospect, Zinn's and Parrish's decision to continue negotiating and finally sign with the Ben-

---

1. Under the draft process as it existed in 1970, once a player was selected by any given team, no other team could negotiate with or sign that player. If he was unable to reach a satisfactory accord with the team that had picked him, he could not play in the NFL. *See generally Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978) (concluding that the NFL draft violated the Sherman Act).

gals was a sound one, for the Sharks and the rest of the WFL with them folded in 1975 due to a lack of funds.

Shortly after signing the 1974 series of contracts, Parrish informed Zinn by telephone that he "no longer needed his services." By letter dated October 16, 1975 Parrish reiterated this position, and added that he had no intention of paying Zinn a 10% commission on those contracts. In view of its disposition of the case, the district court made no specific fact finding as to the amounts Parrish earned during the 1974–77 seasons. Zinn claims that the total was at least $304,500 including bonus and performance clauses. The 1971 contract by its terms entitled Zinn to 10% of the total amount as each installment was paid, and Zinn claims that he has only received $4,300 of the amounts due him. Accordingly, this suit was filed to recover the balance, plus interest at the rate of 5% per annum for vexatious delay in payment, pursuant to Ill.Rev.Stat., ch. 74, § 2.

In addition to negotiating the Bengals contracts, Zinn performed a number of other services at Parrish's request. In 1972 he assisted him in purchasing a residence as well as a four-unit apartment building to be used for rental income; he also helped to manage the apartment building. That same year Zinn negotiated an endorsement contract for Parrish with All-Pro Graphics, Inc., under which Parrish received a percentage from the sales of "Lemar Parrish" t-shirts, sweat-shirts, beach towels, key chains, etc. The record shows that Zinn made a number of unsuccessful efforts at obtaining similar endorsement income from stores with which Parrish did business in Ohio. He also tried, unsuccessfully, to obtain an appearance for Parrish on the Mike Douglas Show. Zinn arranged for Parrish's taxes to be prepared each year by H & R Block.[2]

The evidence showed that, despite his efforts, Zinn was unable to obtain off-season employment for Parrish. In this connec-

tion, however, it was Zinn's advice to Parrish that he return to school during the off-season months in order to finish his college degree, against the time when he would no longer be able to play football. With respect to Zinn's obligation to provide Parrish with advice on "business investments," he complied first, by assisting in the purchase of the apartment building; and second, by forwarding to Parrish the stock purchase recommendations of certain other individuals, after screening the suggestions himself. There was no evidence that Zinn ever forwarded such recommendations to any of his other clients; he testified that he only did so for Parrish. In summing up Zinn's performance under the contract, Parrish testified as follows:

Q: Did you ever ask Zinn to do anything for you, to your knowledge, that he didn't try to do?

A: I shall say not, no.

## DISCUSSION

### I

We turn, first, to the district court's decision that Zinn's contract was void under the 1940 Act. The Act makes void any contract for investment advice made by an unregistered adviser. 15 U.S.C. § 80b–15(b). The issue thus presented is whether Zinn was engaged by reason of the terms of his contract and all his activities thereunder in the business of advising others as to security transactions. If so, he was required to register as an investment adviser. 15 U.S.C. § 80b–3(a). An investment adviser is defined under the Act as:

any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b–2(a)(11).

---

2. Once Zinn secured the services of H & R Block for Parrish, his obligation ended. Parrish's contention on appeal that Zinn was at

fault for a dispute he later had with the IRS requiring the payment of additional taxes is unfounded.

The district court held that Zinn fell within the definitional requirements of the Act and was an investment adviser because: 1) the 1971 Management Contract stated that Zinn would provide advice on "business investments," and Zinn let others know by word of mouth that he was available as a personal manager, he was "holding himself out" to the public as an investment adviser; 2) Zinn "solicited the advice of others and transmitted to [Parrish] those investment recommendations, after screening by [Zinn]"; and 3) Zinn "accepted and invested funds sent to him" by Parrish for investment purposes. The court's conclusion, however, does not follow from its premises.

The 1940 Act was enacted as Title II of comprehensive regulations covering both investment companies and investment advisers. It was "the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). As a remedial statute, it must be read broadly in order to effectuate its purpose of "protect[ing] the public and investors against malpractices by persons paid for advising others about securities." *SEC v. Wall Street Transcript Corp.*, 422 F.2d 1371, 1376 (2d Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970), *quoting* [1960] U.S.Code Cong. & Admin.News 3503. At the same time, the definitional requirements of the statute must be interpreted so as not to sweep in persons whose activities Congress did not intend to regulate on the theory that they posed no national concern.

Among the factors the SEC looks to in determining whether someone "holds himself out" as an investment adviser are:

"[t]he maintenance of a listing as an investment adviser in a telephone or business directory"; "the expression of willingness to existing clients or others to accept new clients"; or "the use of a letterhead indicating any activity as an investment adviser." *In re Frank T. Hines*, [1972–73 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 78,963 at p. 82,074; *accord, DJZ Assoc. Investments Mgt.*, [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,384. The evidence showed that Zinn's listing in his office building directory was "Public Relations Consultant." His ad in the Chicago Yellow Pages was under the heading of "Public Relations." His letterhead did not contain the phrase "investment adviser" but only "Public Relations Consultant." The testimony showing that Zinn was, by word of mouth, available as a personal manager for both employment and business advice was not evidence that Zinn was available as an investment adviser.

The court failed to distinguish between ordinary business advice and advice on securities.[3] For example, Parrish purchased his own home and also an interest in an apartment building with the assistance of Zinn's advice, but this was not investment advice within the terms of the 1940 Act. Zinn was not engaged in a "common venture" with Parrish simply because he engaged in certain managerial tasks at Parrish's request with respect to the apartment building. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (definition of an investment contract). Both Parrish and the district court relied too heavily on *First United Management Corp.*, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,742, which is in fact inapposite. There the SEC ruled that "the offer of . . . limited partnerships [in real estate] by First United to its [professional athlete] clients would con-

---

3. It is crucial to note that nothing in Zinn's contract obligated him to provide advice on *securities* investments, as that term is defined in 15 U.S.C. § 80b–2(a)(18). The Securities Acts were not designed to provide a remedy for every instance of a breach of common-law fiduciary duties. *Santa Fe Industries, Inc. v.*

*Green*, 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). The district court was in error in concluding that Congress by enacting the 1940 Act "intended to regulate" the relationship between an athlete and his manager.

stitute investment advice." *Id.* at p. 83,984. Zinn made no offer to Parrish of a limited partnership interest in real estate, for in fact Parrish was the sole owner of the apartment building. Another factor which influenced the district court in reaching its conclusion that Zinn was an investment adviser was Parrish's testimony that he had sent Zinn about $1500 "to invest ... in his company," in return for which he was to receive "something like 20 percent" on his investment. He later asked for his money back, received a part of it, and applied the balance against fees due Zinn. In finding that Zinn "accepted and invested funds sent to him" by Parrish for investment, the district court apparently was referring to these transactions, which in our view did not constitute advice to purchase a security in the form of an investment contract. *United Housing,* 421 U.S. at 852, 95 S.Ct. at 2060.

■ It is true that Zinn might have been compelled to register as an investment adviser, even if he limited his activities to screening the securities recommendations of others before passing them along to clients, *SEC v. Wall Street Transcript Corp.,* 454 F.Supp. 559 (S.D.N.Y.1978), if he made a business of such activities. But isolated transactions with a client as an incident to the main purpose of his management contract to negotiate football contracts do not constitute engaging in the business of advising others on investment securities. *See, e. g., de Bruin v. Andromeda Broadcasting Systems,* 465 F.Supp. 1276, 1279 (D.Nev. 1979). From the evidence, Parrish was the only one of his personal management clients to whom he transmitted securities recommendations from others.

4. That section provides that the registration requirements of the 1940 Act shall not apply to:
* * * * * *
(3) any investment adviser who during the course of the preceding twelve months has had fewer than fifteen clients and who neither holds himself out generally to the public as an investment adviser nor acts as an investment adviser to any investment company

Zinn was not a dealer or trader in securities and there was no evidence to indicate that he was financially interested in the securities recommendations he passed along. Therefore the conflict of interest at which the Act was aimed was not present here. *SEC v. Capital Gains Research Bureau,* 375 U.S. at 191–92, 84 S.Ct. at 282–283. In substance, his position was similar to that of a professional trustee whose advice to his clients on securities is "solely incidental to his duty as a professional trustee." *In re Augustus P. Loring, Jr.,* 11 SEC 885, 886–87, 41–45 Dec. ¶ 75,299 (1942). In the *Loring* case the SEC further concluded that the trustee was not an investment adviser because he did not "hold himself out as being engaged in the business of giving advice to others as to securities." We note that here as well, the district court found as a fact that Zinn "did not provide substantial investment advice"—a finding in derogation of its final conclusion. Neither the execution of the management contract by Zinn nor his conduct thereunder made him an investment adviser. Accordingly, we need not reach the question whether Zinn's conduct fell within the "de minimus" exception to the registration requirements of the 1940 Act. *See* 15 U.S.C. § 80b–3(b)(3).[4]

## II

We consider next the district court's judgment that Zinn failed to perform the terms and conditions of his contract.[5] Upon this issue, the district court made the following findings:

The evidence was clear that [Zinn] did not, in fact, procure employment for [Parrish], did not obtain off-season employment for [Parrish], did not provide

registered under [the Investment Companies Act of 1940].

5. The terms of the 1971 contract provided that Illinois would be the "situs" of the contract, and the parties proceeded on the assumption that Illinois law governs its interpretation. Since neither party has objected to the application of Illinois law, we conclude that the parties have consented thereto.

substantial investment advice, did not secure any more than the most superficial tax consultation and did not seek in any substantial respect endorsement contracts and other profitable marketing connections.

From these findings the court concluded that Zinn "was unable to and did not provide the services which he was obligated to provide by the contract under which he sues." We address the findings seriatim.

*Employment Procurement*

Zinn's obligation under the 1971 Management Contract to procure employment for Parrish as a profootball player was limited to the use of "reasonable efforts." [6] At the time the contract was signed, Parrish was already under contract with the Cincinnati Bengals for the 1970–71 season, with a one-year option clause for the 1971–72 season exercisable by the Bengals. Parrish could not, without being in breach of his Bengals contract, enter into negotiations with other teams for the 1971–72 season. The NFL's own rules prevented one team from negotiating with another team's player who had not yet attained the status of a "free agent".[7] At no time relevant to this litigation did Parrish become a free agent. Thus, unless he decided to contract for future services for the year following the term of the option clause with the Canadian or World Football League, Parrish's only sensible course of action throughout the time Zinn managed him was to negotiate with the Bengals.

Parrish had no objection to Zinn's performance under the professional management contract for the first three years up to 1973, during which time Zinn negotiated football contracts for Parrish. A drastic change, however, took place in 1974 when a four-season contract was negotiated with the Bengals for a total of $250,000 plus a substantial signing bonus. At that time, the new World Football League came into existence and its teams, as well as the teams of the Canadian Football League, were offering good terms to professional football players as an inducement to jump over to their leagues from the NFL. In order to persuade Parrish to remain with the team, the Bengals club itself first initiated the renegotiation of Parrish's contract with an offer of substantially increased compensation. This was not surprising.

Parrish claims, however, that Zinn should have obtained offers from the World Football League that would have placed him in a stronger negotiating position with the Bengals. This is a rather late claim. It was not mentioned in Parrish's letter of termination, and is entirely speculative. Given what Zinn accurately perceived as the unreliability of any offers he might have obtained from the WFL, his representation of Parrish during this period was more than reasonable.[8] As the district court properly noted, prior to the signing of the 1974–77 series of football contracts the needs of the defendant, the services of the plaintiff, and the fees paid by the defendant for those services were all "relatively modest." We conclude that up to that point it is impossible to fault Zinn in the performance of his contract, nor can we find any basis for Parrish to complain of

---

**6.** Parrish contended that Zinn's obligation to procure employment made him a private employment agency under Illinois law. The district court concluded that Zinn's business was not within the scope of the Illinois regulations, since he was not involved in providing "placement services to the general public." We agree. *See National Talent Associates, Inc. v. Holland,* 76 Ill.App.3d 556, 32 Ill.Dec. 195, 395 N.E.2d 142 (1979).

**7.** A player can become a free agent by: 1) not being drafted during the Spring college draft;

2) being placed on waivers after signing with a particular team; or 3) playing out his option year with his club.

**8.** Had Zinn obtained for Parrish a contract with a WFL team for the season following the option year, with an acceleration clause making the contract effective a year earlier should the option not be exercised, he might have embroiled Parrish in costly litigation. *See, e. g., Cincinnati Bengals v. Bergey,* 453 F.Supp. 129 (S.D.Ohio 1974); *Bowman v. National Football League,* 402 F.Supp. 754 (D.Minn.1975).

Zinn's efforts in 1974 with respect to procuring employment for him as a pro-football player.

*Other Obligations*

We focus next on the other obligations, all incidental to the main purpose of the contract. The first of these refers to "[n]egotiating employment contracts with professional athletic organizations and others." Unless this is with respect to a professional football contract, it is difficult to understand to what "professional athletic organizations and others" refers. At all events, there is no claim that there was a failure to negotiate employment contracts with other athletic organizations. And the evidence clearly shows that Zinn performed substantial services in negotiating with the Bengals by letter, telephone, and in person when he and Parrish were flown at the Bengals' expense to Cincinnati for the final stage of negotiations on the 1974–77 series of contracts.

Zinn was further obligated to act in Parrish's professional interest by providing advice on tax and business matters, by "seek[ing] . . . endorsement contracts," and by making "efforts" to obtain for Parrish gainful off-season employment. Each of these obligations was subject to an implied promise to make "good faith" efforts to obtain what he sought. *See, e. g., Bonner v. Westbound Records, Inc.,* 76 Ill.App.3d 736, 31 Ill.Dec. 926, 394 N.E.2d 1303 (1979); *Van C. Argiris Co. v. Caine Steel Co.,* 20 Ill.App.3d 315, 314 N.E.2d 361, 366 (1974). Under Illinois law, such efforts constitute full performance of the obligations. *Id.* Until Parrish terminated the contract, the evidence was clear that Zinn made consistent, good faith efforts to obtain off-season employment and endorsement contracts. Indeed the district court found that Zinn at all times acted in good faith, with a willingness "to provide assistance within his ability." The district court confused success with good faith efforts in concluding that Zinn's failure to obtain in many cases jobs or contracts for Parrish was a failure to perform. Moreover, Zinn did give business

advice to Parrish on his real estate purchases, and he did secure tax advice for him.

Parrish fully accepted Zinn's performance for the years 1970, 1971, 1972, and 1973 by remitting the 10% due Zinn under the contract. Parrish was at all times free to discharge Zinn as his agent before a new season began. Instead, he waited until Zinn had negotiated a series of contracts worth a quarter of a million dollars for him before letting Zinn know over the phone that his services were no longer required. That call, coupled with Parrish's failure to make the 10% commission payments as they came due, was a breach of the 1971 contract. *Watson v. Auburn Iron Works, Inc.,* 23 Ill.App.3d 265, 318 N.E.2d 508, 511 (1974). The district court was in error in considering Zinn's performance or non-performance during the period following that call, for Parrish by his own breach excused Zinn from any further duties under the contract. *Olsen v. Scholl,* 38 Ill.App.3d 340, 347 N.E.2d 195, 198 (1976). Zinn had no obligations thereafter, and Parrish was estopped from asserting Zinn's non-performance as a defense to the suit on the commission fees due him. *Gamm Construction Co. v. Townsend,* 32 Ill.App.3d 848, 336 N.E.2d 592, 594 (1975). Therefore Zinn has a right to recover a 10% commission on all amounts earned by Parrish under the 1974, 1975, 1976, and 1977 Bengals contracts.

We must disagree with the district court's interpretation of the terms of the contract, and Zinn's obligations thereunder, and also with its findings and conclusions concerning Zinn's performance. Insofar as the district court made any findings of fact which are inconsistent with the foregoing, we find them to be clearly erroneous. Consequently, judgment should be entered for Zinn. The decision of the district court is REVERSED, and the case REMANDED for further proceedings consistent with this opinion, including the calculation of damages and interest, if any, due Zinn.