# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 22, 2019

No. 18-10510

Lyle W. Cayce
Clerk

In the Matter of: LIVING BENEFITS ASSET MANAGEMENT, L.L.C.,

> Debtor

-------------------------------------------------------------------------------------

LIVING BENEFITS ASSET MANAGEMENT, L.L.C.,

> Appellant

v.

KESTREL AIRCRAFT COMPANY, INCORPORATED,

> Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, HIGGINSON, and COSTA, Circuit Judges.

KING, Circuit Judge:

Debtor–plaintiff Living Benefits Asset Management, L.L.C., brought this adversary proceeding against Kestrel Aircraft Co. for breach of contract. Living Benefits alleges that Kestrel failed to pay almost $900,000 owed for services that Living Benefits provided Kestrel to help it collateralize a corporate debt offering with life settlements. Following a bench trial, the bankruptcy court held that the contract was voidable because Living Benefits

No. 18-10510

failed to register as an investment adviser in violation of the Investment Advisers Act of 1940. The district court affirmed the bankruptcy court's judgment. Living Benefits now appeals the district court's judgment. For the reasons stated herein, we AFFIRM.

## I.

Much of this dispute centers on the treatment under federal securities laws of so-called life settlements, which are financial instruments involving the sale of insureds' rights under life-insurance policies to third-party investors. In a typical life settlement, a buyer pays the insured more than the policy's surrender value (i.e., the amount of money the insurer would pay the insured to cancel the policy) but less than the death benefit. Thus, in selling a life settlement, the insured transfers some of the policy's value along with the risk that the value will diminish if the insured lives beyond his or her life expectancy. To put it bluntly, a life settlement is a bet on the length of the insured's life.

Although life settlements are fairly simple instruments at their core, a complex market has developed around them over the past three decades. Generally, the sale of a life settlement involves multiple intermediaries. A broker identifies and works on behalf of an insured to solicit offers or negotiate a sale. A provider then locates one or more investors, who buy either fractionalized or whole interests in the life settlement under terms negotiated between the provider and broker. The provider will typically arrange for a third-party agent to pay the policy's premiums out of escrow. In the event the insured survives longer than expected, the escrow account could deplete, and the investor might become responsible to pay the premiums to prevent the policy from lapsing.

The return on a life settlement diminishes with each premium payment; thus, the longer the insured lives, the lower the return on the investment. The

No. 18-10510

actuarial estimate of the insured's lifespan therefore dictates the purchase value of a life settlement. And the return on investment depends on the accuracy of that estimate.[1] Accordingly, whether an investment in a life settlement is successful depends primarily on the provider's assessment—usually through a third-party underwriter—of the insured's life expectancy and the price the provider negotiates based on that assessment. *See* Joy D. Kosiewicz, *Death for Sale: A Call to Regulate the Viatical Settlement Industry*, 48 Case Western Res. L. Rev. 701, 704 (1998).

The specifics of this case involve an unfulfilled plan by defendant Kestrel Aircraft Co. ("Kestrel") to purchase life settlements to use as collateral in a corporate debt offering. Kestrel hoped to raise $135 million to develop a prototype of an aircraft it sought to manufacture and to purchase most of the assets of a competing aircraft manufacturer. As part of its financing scheme, Kestrel planned to offer investors the option of taking a security interest in life settlements that it would purchase. Kestrel retained debtor–plaintiff Living Benefits Asset Management, L.L.C., ("Living Benefits") to help develop and ultimately execute this proposal.

Living Benefits and Kestrel entered into an engagement letter, which set out the terms of Living Benefits' services. Living Benefits promised to provide Kestrel with "consulting and advisory services" in connection with Kestrel's financing plan. These services included helping Kestrel structure its financing plan, preparing a memorandum for investors, advising Kestrel "in structuring of the evaluation, acquisition and ownership of the Life Settlements," and "selecting and retaining strategic partners for [Kestrel], including a suitable

---

[1] The other primary risk is the insurer's refusal to pay the benefit because of the insured's failure to pay a premium, the insured's fraud, a no-assignment clause, or some other factor that could void the policy. This risk can be all but eliminated through proper administration and due diligence.

No. 18-10510

custodian for the Life Settlements." Kestrel agreed to pay Living Benefits $950,000 for these services.

Kestrel did not commit itself in the engagement letter to purchasing any life settlements. But it agreed that to the extent it did acquire any life settlements within the two following years, it would "engage[] [Living Benefits] to originate such Life Settlements" pursuant to a separate agreement attached as an exhibit to the engagement letter.

The attached agreement, which the parties refer to as the "origination agreement," specified Living Benefits' contemplated role in assisting Kestrel to acquire life settlements. Living Benefits would first identify life settlements available for purchase and relay certain information to Kestrel about the insured and the policy, including the value of the death benefit and an estimate of the insured's life expectancy. Kestrel would then let Living Benefits know whether it wanted to purchase the identified life settlement and the price it was willing to pay.  Once Kestrel decided to purchase a specific life settlement, Living Benefits would, "to the extent requested by [Kestrel]," assist Kestrel in evaluating the terms of the offer and communicating with the seller. Upon reaching a sale agreement, Living Benefits would then conduct due diligence to ensure, among other things, that the policy was valid and transferable, and the seller was the policy's lawful owner. In exchange for the services set out in the origination agreement, Kestrel would pay Living Benefits an initial $50,000 engagement fee and a commission equal to 1.25% of the aggregate death benefits of the purchased policies.

Living Benefits performed its obligations under the engagement letter. But Kestrel's fundraising efforts were ultimately unsuccessful; thus, Kestrel did not purchase any life settlements, and the parties never entered into the origination agreement. Kestrel subsequently failed to pay almost $900,000 owed to Living Benefits under the engagement letter.

No. 18-10510

Living Benefits subsequently filed for Chapter 11 bankruptcy. It initiated the present suit against Kestrel as an adversary proceeding in the bankruptcy court to collect the money owed under the engagement letter. Following a bench trial, the bankruptcy court found that Kestrel breached the engagement letter by failing to pay the agreed-upon fee. But it also found that Living Benefits was required to register as an investment adviser under the Investment Advisers Act of 1940 ("IAA") yet failed to do so. Accordingly, it concluded that the engagement letter was voidable and Living Benefits was not entitled to collect any of the funds due under the letter. Living Benefits appealed to the district court. It argued that the bankruptcy court erred in concluding that it was an investment adviser. The district court affirmed. Living Benefits now appeals to this court.[2]

## II.

In reviewing an appeal from a district court's review of a bankruptcy court's ruling, "this court applies 'the same standard of review to the bankruptcy court decision that the district court applied.'" *Galaz v. Galaz (In re Galaz)*, 765 F.3d 426, 429 (5th Cir. 2014) (quoting *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 723 F.3d 313, 317 (5th Cir. 2013)). "Thus, this court reviews factual findings for clear error and legal conclusions *de novo.*" *Id.*

The IAA prohibits unregistered investment advisers from using the instrumentalities of interstate commerce "in connection with" their businesses. 15 U.S.C. § 80b-3(a). A contract made in violation of the IAA is void as to the unregistered adviser. *Id.* § 80b-15(b); *see also Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 16 (1979) ("At the very least Congress must have assumed that § [80b-15] could be raised defensively in private litigation

---

[2] Kestrel failed to file a response brief or otherwise enter an appearance in this appeal. It participated fully in this litigation in the bankruptcy court and district court, however. We thus look to its filings below to aid our analysis.

No. 18-10510

to preclude the enforcement of an investment advisers [sic] contract."). Living Benefits does not dispute that to the extent the bankruptcy court correctly concluded Living Benefits was an investment adviser, it cannot recover the balance owed on the engagement letter. The sole question in this appeal is thus whether Living Benefits was an investment adviser within the meaning of the IAA.

Subject to certain exceptions not relevant here, the IAA defines investment adviser as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

Living Benefits argues that it is not an investment adviser because (1) it is not in the business of advising others "as to the value of . . . or as to the advisability of investing in, purchasing, or selling" life settlements and, in any event, (2) life settlements are not securities. We address each argument in turn.

**A.**

In arguing that it is not in the business of advising others about the value of life settlements, Living Benefits focuses on the fact that it never entered into the origination agreement with Kestrel. It asserts that the services it rendered under the *engagement letter* did not constitute advice as to the value of life settlements or the advisability of transacting in life settlements. Living Benefits concedes that it advised Kestrel about transacting in life settlements generally, but it insists that it did not render any advice about the value or

advisability of investing in specific life settlements. And it says the IAA only extends to those rendering advice about specific securities.

We disagree. Living Benefits cites to no caselaw holding that the IAA requires advice about a specific security before a person or entity must register as an investment adviser. Rather, it rests its entire argument on *Lowe v. SEC*, 472 U.S. 181 (1985). In that case, the Supreme Court held that the publisher of a newsletter about securities, though meeting the prima facie definition of an investment adviser, fell within an exception for publishers. *Id.* at 203-04, 211. In reaching this conclusion, the Court extensively surveyed the IAA's legislative history to ascertain the species of advisers and advice Congress sought to regulate. *See id.* at 190-201.

Living Benefits insists that this same legislative history shows Congress intended to exclude the generalized advice it provided Kestrel under the engagement letter. But *Lowe* looked to this legislative history to interpret a specific exception to the IAA. Living Benefits does not claim the benefit of any such exception. *See id.* at 208-09. And even if we were to overlook this distinction, Living Benefits comes away from *Lowe* with the wrong lesson. In *Lowe,* the Court concluded that Congress did not mean to cover generalized advice not "attuned to any specific portfolio *or to any client's particular needs*." *Id.* at 208 (emphasis added). Living Benefits might not have attuned its advice to any specific life-settlement portfolio, but it certainly attuned its advice to Kestrel's particular needs.

Living Benefits' argument directly contradicts the SEC's position on this matter. The SEC has interpreted the IAA to cover "persons who advise clients concerning the relative advantages and disadvantages of investing in securities in general as compared to other investments." Applicability of the Investment Advisers Act, 52 Fed. Reg. 38400, 38402 (Oct. 16, 1987). And it has said that "a person who, in the course of developing a financial program for a

client, advises a client as to the desirability of investing in, purchasing or selling securities, as opposed to, or in relation to, any non-securities investment or financial vehicle would . . . be 'advising' others within the meaning of" the IAA. *Id.* Although the SEC's interpretation does not bind us, we defer to it here in the absence of contrary authority. *See SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 525 (5th Cir. 1974) (holding that an "SEC release is entitled to great weight" although "it is not dispositive").

There is a similar dearth of authority to support Living Benefits' assertion that Kestrel's failure to act on its advice somehow carries it beyond the IAA's purview. Living Benefits cites a series of out-of-circuit cases in which courts found IAA violations in situations in which the clients acted upon the advisers' suggestions. But none of these cases supports the negative implication that absent such action, there would have been no IAA violation. *See United States v. Miller*, 833 F.3d 274, 282 (3d Cir. 2016); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 399-400 (D.C. Cir. 2007); *United States v. Elliott*, 62 F.3d 1304, 1311 (11th Cir. 1995); *Abrahamson v. Fleschner*, 568 F.2d 862, 870-71 (2d Cir. 1977).

Living Benefits' argument runs counter to the plain language of the IAA, which prohibits unregistered agents from "advising others . . . as to the *advisability* of investing" in securities. § 80b-2(a)(11) (emphasis added). This language encompasses both positive and negative advice. *See Advisable*, Webster's New International Dictionary of the English Language (2d ed. 1934) ("Proper to be advised or done; expedient; prudent."). Reading it otherwise would rest the IAA's application on the fortuity of the client's actions and would categorically exclude those who advise against trading in securities, which would make little policy sense.

Living Benefits also argues that regardless of whatever advice it might have provided Kestrel, it falls outside the IAA's gamut because such advice

was merely incidental to its business. The bankruptcy court found otherwise, concluding that "the evidence established that [Living Benefits] was in the business . . . of advising others, including Kestrel, as to the advisability of investing in life settlements." This finding is not clearly erroneous. The engagement letter makes clear that Kestrel retained Living Benefits for the specific purpose of receiving advice about investing in life settlements. Indeed, it lists within the scope of Living Benefits' services, "advising [Kestrel] in structuring of the . . . acquisition . . . of the Life Settlements."

These findings distinguish this case from *Zinn v. Parrish*, 644 F.2d 360 (7th Cir. 1981). In that case, the Seventh Circuit held that a sports agent who provided a client with investment advice was not in the business of being an investment adviser. *Id.* at 364. The agent in that case occasionally gave his client investment advice, but the court held that "isolated transactions with a client as an incident to the main purpose of his management contract to negotiate football contracts do not constitute engaging in the business of advising others on investment securities." *Id.* Here, Living Benefits did not give Kestrel advice about life settlements "as an incident to the main purpose" of the engagement letter—such advice *was* the main purpose of the engagement letter.

Accordingly, we conclude that Living Benefits contracted with Kestrel to advise it about life settlements within the meaning of the IAA.

**B.**

We now address Living Benefits' second proposition: that it did not need to register as an investment adviser because the life settlements at issue were not securities. The IAA defines security as:

> any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share,

> investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security (including a certificate of deposit) or on any group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guaranty of, or warrant or right to subscribe to or purchase any of the foregoing.

15 U.S.C. § 80b-2(a)(18). This definition is substantively identical to the definition of security found in the Securities Act of 1933 (the "Securities Act"). *Compare id.* § 77b(a)(1), *with* § 80b-2(a)(18). Accordingly, the parties agree that caselaw interpreting the Securities Act informs whether an instrument is a security for purposes of the IAA. *Cf. SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) ("Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation . . . .").

Further, both parties agree that to the extent the life settlements at issue are securities under the IAA, it is because they are investment contracts. And they agree the test that the Supreme Court set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), governs whether an instrument is an investment contract. The Court in *Howey* explained that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99. We have elaborated that "[t]his test subsumes within it three elements: first, that there is an investment of money; second, that the scheme in which an investment is made functions as a common enterprise; and third, that under the scheme, profits are derived solely from the efforts of individuals other than the

No. 18-10510

investors." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974). We interpret the *Howey* test broadly. *See id.* at 481.

This and other courts have clarified two important aspects of the *Howey* test. Uncontroversially, "the word 'solely' in the third prong of the Howey test has not been construed literally." *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 133 (5th Cir. 1989). Rather, we apply "a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. May 1981) (en banc) (quoting *SEC v. Glen W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)).

More controversial is the meaning of "common enterprise" in *Howey*'s second prong. This circuit, along with the Eleventh Circuit, applies so-called broad vertical commonality, under which a common enterprise exists when "the fortuity of the investments collectively is essentially dependent upon promoter expertise." *SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974); *see also Eberhardt v. Waters*, 901 F.2d 1578, 1580-81 (11th Cir. 1990). Other circuits apply one or both of two more restrictive tests: horizontal commonality, under which a class of investors must share equally in the risk such that their investments rise and fall together, or strict vertical commonality, under which the investor and the promoter must share equally in the risk.[3]

---

[3] *Compare Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 465 (7th Cir. 2014) (applying horizontal commonality); *SEC v. SG Ltd.*, 265 F.3d 42, 50 (1st Cir. 2001) (same); *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 187-88 (3d Cir. 2000) (same); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614-15 (D.C. Cir. 2000) (same); *Teague v. Bakker*, 35 F.3d 978, 986 n.8 (4th Cir. 1994) (same); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (same); *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) (same); *and Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 281 (6th Cir. 1989) (same), *with SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1339-40 (9th Cir. 1994) (applying strict vertical commonality as

11

No. 18-10510

We developed the strict vertical commonality approach in *Koscot*. In finding a pyramid scheme operated as an investment contract, we rejected the argument that the scheme was not a common enterprise because a participant's return from his or her investment in the scheme was independent of other investors. *See Koscot*, 497 F.2d at 474, 479. "Rather," we explained, "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [defendant's] meetings and guidelines on recruiting prospects and consummating a sale." *Id.* at 479. In distinguishing the *Koscot* broad vertical commonality test from the strict vertical commonality test followed by the Ninth Circuit, we later elaborated:

> While our standard requires interdependence between the investors and the promoter, it does not define that interdependence narrowly in terms of shared profits or losses. Rather, the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise even where the promoter receives only a flat fee or commission rather than a share in the profits of the venture.

*Long*, 881 F.2d at 140-41.

Under this circuit's broad vertical commonality approach, "the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Id.* at 141; *see also* Monaghan, *supra* n.3, at 2161-62 ("Whenever there is an investment of money with the expectation of profits to come solely from the efforts of others, the investor probably also relies on the expertise of the promoter."). Accordingly, absent the unusual case in which an investor relies on the promoter's expertise but does not expect profits to come from the

alternative to horizontal commonality). *See generally* Maura K. Monaghan, Note, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L. Rev. 2135, 2152-63 (1995) (discussing circuit split).

No. 18-10510

promoter's efforts, an investment contract exists if there is an investment of money in reliance on the promoter's expertise.

### 1.

Before turning to the parties' specific arguments, we survey the existing cases examining whether life settlements are investment contracts. It is important to keep in mind that agreements involving sales of life settlements can have myriad structures; thus, because the *Howey* analysis is fact dependent, the question of whether life settlements are investment contracts is not amenable to a universal answer. Nevertheless, to the extent life settlements share certain features in common, the caselaw is instructive.

The D.C. Circuit and the Eleventh Circuit are split on how to analyze life settlements[4] under the *Howey* test. In *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), the SEC sought to enjoin a firm from arranging life-settlement transactions without registering the life settlements as securities. *Id.* at 537-38. Before locating investors, the defendant in that case would evaluate the insured's medical condition, review the insurance policy, and negotiate the purchase price with the insured. *Id.* at 539. The defendant would then locate investors to purchase fractionalized interests in the life settlement. *Id.* After the sale, the defendant would continue to administer the policy through a third-party escrow agent, although the defendant eventually ceased its post-purchase administrative functions in a fruitless attempt to appease the SEC and the district court. *Id.* at 539-40.

Applying the *Howey* test, the D.C. Circuit found the presence of an investment of money and horizontal commonality, satisfying *Howey*'s first two prongs. *Id.* at 543-44. But the court found that the third *Howey* prong was

---

[4] These cases dealt specifically with viatical settlements, a subset of life settlements in which the insureds are terminally ill. This distinction makes no difference for present purposes.

lacking. In reaching this conclusion, the court divided the efforts that made the life settlements profitable into categories of managerial or ministerial, and pre-purchase or post-purchase. *Id.* at 545. It then opined that the third prong's focus was on whether the investment's profitability depended on post-purchase managerial efforts of someone other than the investor. *Id.* at 548. Pre-purchase managerial efforts, the court explained, were relevant but could not satisfy the third prong in the absence of post-purchase managerial efforts; ministerial efforts did not affect the equation. *Id.* at 546, 548; *see also SEC v. Life Partners, Inc.*, 102 F.3d 587, 588 (D.C. Cir. 1996) (Ginsburg, J., concurring in denial of rehearing) (explaining that pre-purchase efforts could be relevant, but are insufficient on their own, to demonstrate that profits arose primarily from the efforts of others). Formulated in this manner, the court found that all of the defendant's managerial efforts—finding the life settlements, obtaining actuarial estimates, appraising the life settlements, and negotiating the purchase price—occurred pre-purchase. *Life Partners*, 87 F.3d at 547. Its post-purchase efforts in administering the life settlements were ministerial. *Id.* at 546. Accordingly, the court concluded that the life settlements did not meet *Howey*'s third prong. *Id.* at 548.

The dissent rejected the court's pre- and post-purchase distinction. *Id.* at 551 (Wald, J., dissenting). The dissent accused the court of elevating form over substance in violation of the Securities Act's remedial purpose. *See id.* The better inquiry, it insisted, was into "the kind and degree of dependence between the investors' profits and the promoter's activities," with the third prong being met "when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized." *Id.* And the dissent noted that the three variables affecting whether a life settlement is profitable are the accuracy of the actuarial estimate, the sale

No. 18-10510

price, and the enforceability of the policy—for each of which investors depended on the defendant. *Id.* at 555.

Faced with a similar dispute, the Eleventh Circuit sided with the *Life Partners* dissent. *See SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743 (11th Cir. 2005). As in *Life Partners*, the defendant in *Mutual Benefits* arranged the sales of life settlements from insureds to investors and performed many of the same pre-purchase activities, including evaluating the insured's medical condition, producing an actuarial estimate, and negotiating a purchase price. *Id.* at 738. It also administered the policies after the sale to investors. *Id.* at 738-39. Applying the *Howey* test, the court first found it undisputed that the life settlements at issue met *Howey*'s first two prongs. *Id.* at 742-43. In response to the defendant's "passing objection," it observed in a footnote that broad vertical commonality existed (satisfying the second prong) because "any profits were tied to the efforts of the promoters." *Id.* at 743 n.4. In finding the third *Howey* prong present, the court expressly rejected *Life Partners*' analysis and focused instead on the investors' reliance on the defendant's pre-purchase activities. It explained:

> MBC selected the insurance policies in which the investors' money would be placed. MBC bid on policies and negotiated purchase prices with the insureds. MBC determined how much money would be placed in escrow to cover payment of future premiums. MBC undertook to evaluate the life expectancy of the insureds— evaluations critical to the success of the venture. If MBC underestimated the insureds' life expectancy, the chances increased that the investors would realize less of a profit, or no profit at all. And, investors had no ability to assess the accuracy of representations being made by MBC or the accuracy of the life-expectancy evaluations. They could not, by reference to market trends, independently assess the prospective value of their investments in MBC's viatical settlement contracts.

*Id.* at 744. Accordingly, the court concluded, the defendant "offered what amounts to a classic investment contract. Investors were offered and sold an investment in a common enterprise in which they were promised profits that were dependent on the efforts of the promoters." *Id.*

With rare exceptions, federal district courts and state courts[5] have sided with the Eleventh Circuit's analysis over the D.C. Circuit's analysis. *See, e.g.*, *Giger v. Ahmann*, No. 09-c-4060, 2013 WL 6730108, at \*4-5 (N.D. Ill. Dec. 20, 2013); *SEC v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 555-56 (W.D. Tex. 2013); *Wuliger v. Eberle*, 414 F. Supp. 2d 814, 821-22 (N.D. Ohio 2006); *Siporin v. Carrington*, 23 P.3d 92, 99 (Ariz. Ct. App. 2001); *Poyser v. Flora*, 780 N.E.2d 1191, 1197 (Ind. Ct. App. 2003); *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 681 (Tex. 2015). *But cf. SEC v. Pac. W. Capital Grp.*, No. 15-cv-2563, 2015 WL 9694808, at \*8 (C.D. Cal. June 16, 2015) (unpublished) (explaining SEC failed to show life settlements were investment contracts because record was insufficient to show whether investors relied on defendant's significant efforts); *Glick v. Sokol*, 777 N.E.2d 315, 319 (Ohio Ct. App. 2002) (finding life-settlement investors were not dependent on promoter's efforts without looking to federal law and without considering pre-purchase activity). Legal commentators have also been critical of the D.C. Circuit's approach. *See, e.g.*, Miriam R. Albert, *The Death of Death Futures: Why Viatical Settlements Must Be Classified as Securities*, 19 Pace L. Rev. 345, 383-424 (1999) ("The D.C. Circuit had an opportunity to advance the goals of the Securities Laws, while adhering to sound precedent. Instead, the court chose

---

[5] To the extent state courts have weighed in, they have done so while interpreting state statutes analogous to the Securities Act. But these state courts have noted the similarity between the state and federal statutes and have looked to federal law to interpret the state statutes. *Siporin v. Carrington*, 23 P.3d 92, 96 (Ariz. Ct. App. 2001); *Poyser v. Flora*, 780 N.E.2d 1191, 1194-95 (Ind. Ct. App. 2003); *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 666-67 (Tex. 2015).

to create a new bright-line test, with no explicit precedential support, at the cost of ignoring over fifty years of thoughtful case law.").

There are a few key similarities and differences between the life settlements at issue in the present case and those discussed in *Life Partners* and *Mutual Benefits*. Perhaps the most significant similarity is that under the origination agreement, Kestrel would have been dependent upon Living Benefits to obtain actuarial analyses of the insureds. As even the *Life Partners* majority recognized, the accuracy of the actuarial analysis is one of the most important factors in the success or failure of a life settlement. *See* 87 F.3d at 548. Also akin to the life settlements discussed in the cases, the origination agreement here tasks Living Benefits with identifying the life settlements, appraising them, conducting due diligence, and finding a custodian to administer the policies upon Kestrel's purchase. The origination agreement here is unusual in two respects, however: it grants Kestrel at least nominal authority to negotiate the life settlements' purchase price itself, and it contemplates the purchase of nonfractionalized life settlements.[6]

**2.**

Turning now to the parties' specific arguments, we conclude that the life settlements Living Benefits offered to procure for Kestrel are investment contracts.

**a.**

Initially, Living Benefits argues that the life settlements at issue in this case do not meet any of *Howey*'s three prongs because Kestrel never actually purchased any life settlements and the engagement letter did not require it to

---

[6] Although the origination agreement does not specify whether the life settlements would have been fractionalized or nonfractionalized, Living Benefits' managing director testified at trial that the life settlements all would have been nonfractionalized. Kestrel has not disputed this.

do so. Thus, Living Benefits argues there was no investment of money, Kestrel never relied on its expertise, and Kestrel never expected profits from the efforts of another. But as explained above, the inquiry is whether Living Benefits *advised* Kestrel about an investment contract, and we conclude that it advised Kestrel about life settlements regardless of whether Kestrel purchased any. Therefore, we focus on whether the contemplated life settlements were investment contracts; that Kestrel did not in fact purchase any life settlements is beside the point.

**b.**

Next, Living Benefits argues that the life settlements did not meet *Howey*'s second and third prongs because Kestrel was a sophisticated investor that did not rely on Living Benefits' expertise. As *Life Partners* and *Mutual Benefits* instruct, the most important factors bearing on life settlements' profitability are the accuracy of the actuarial estimates and the life settlements' purchase prices. *See Mut. Benefits*, 408 F.3d at 744; *Life Partners*, 87 F.3d at 548. The bankruptcy court found that Kestrel would have depended on Living Benefits to ascertain the life settlements' value. And it found that although "the duties assigned to Kestrel included the duty to negotiate . . . Kestrel had no background in life settlements so Kestrel's negotiations would rely heavily if not exclusively on [Living Benefits]."

Living Benefits disputes the bankruptcy courts' factual conclusions. It argues that whatever inexperience Kestrel might have had with life settlements when it first retained Living Benefits, Living Benefits' consulting services gave Kestrel the level of expertise it needed to successfully invest in life settlements without Living Benefits' continued assistance. As a legal matter, we have previously rejected a similar argument that "investors may become knowledgeable within the meaning of *Howey* through the educative efforts of the promoters." *Long*, 881 F.2d at 135. As a factual matter, the

bankruptcy court did not clearly err in finding that Kestrel would have relied on Living Benefits for these services, whatever the de novo merit of the argument to the contrary.

Living Benefits' own managing director, Mark Freitag, testified to the importance of expertise when transacting in life settlements. Freitag also testified that Living Benefits had proprietary software to model life settlements. Thus, even if Kestrel attained an exceptional level of sophistication in life settlements, there is nothing in the record to suggest that Kestrel could have evaluated life settlements with the same degree of sophistication as Living Benefits. Nor does it matter, as Living Benefits suggests, that Kestrel's executives possessed general business acumen. *See Long*, 881 F.2d at 134-35 ("*Howey* itself establishes that an investor's generalized business experience does not preclude a finding that the investor lacked the knowledge or ability to exercise meaningful control over the venture.").

Moreover, although the bankruptcy court did not make any specific findings about the extent to which Kestrel would have relied on Living Benefits for actuarial estimates, it is clear from the record that Kestrel would have relied on Living Benefits substantially, if not exclusively, for these estimates. The origination agreement made Living Benefits responsible for obtaining the actuarial estimates. And although Kestrel would have had access to the insureds' medical records underlying these actuarial estimates, Living Benefits points to no evidence showing—nor is there reason to believe—that Kestrel would have had the intent or ability to conduct its own analyses.

Living Benefits also points out that Kestrel retained key decision-making powers under the origination agreement such as whether to purchase a particular life settlement and the price it was willing to pay. These powers do not undermine Kestrel's reliance on Living Benefits. Even the *Life Partners*

court found it irrelevant that the investors retained such functions when they were otherwise reliant on the promoter to evaluate the policy and negotiate a worthwhile purchase price. *See* 87 F.3d at 547. Further, even to the extent Kestrel would have nominally determined the price it was willing to pay, its determination could not be untethered from the valuation Living Benefits would have provided it.

Therefore, under the origination agreement, Kestrel would have relied on Living Benefits' substantial pre-purchase efforts for the success of its investments. Under the *Life Partners* rule, however, this would not be enough; Kestrel would have additionally needed to rely on at least some managerial post-purchase efforts. *See* 87 F.3d at 548. At most, Kestrel would have relied on Living Benefits to help it find a custodian to administer the life settlements. But as even the dissent recognized in *Life Partners*, the ministerial actions required to administer a life settlement—typically paying premiums and monitoring the insured's health—are insufficient to satisfy *Howey*. *See id.* at 550-51, 550 n.1 (Wald, J., dissenting).

Were we to follow the *Life Partners* majority, we would thus conclude that the life settlements at issue here are not investment contracts. But we believe the Eleventh Circuit's opinion in *Mutual Benefits* propounds the better approach. As alluded to above, the majority opinion in *Life Partners* has been widely criticized by both courts and commentators. Those criticisms are well founded: *Life Partners* takes an overly rigid approach considering the remedial aim of federal securities law. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004) (discussing Securities Act's broad reach); *Howey*, 328 U.S. at 299 (explaining Securities Act's definition of security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits"); *Long*, 881 F.2d at 133 ("It is axiomatic in federal securities

No. 18-10510

law that in order to give effect to the remedial purposes of the Acts, substantive 'economic realities' must govern over form."). In fact, perhaps realizing *Life Partners'* weakness, Living Benefits does not argue that we should focus solely on its post-purchase efforts.

Following *Mutual Benefits*, we thus conclude that Kestrel would have relied on Living Benefits' expertise and managerial efforts to realize a profit on the life settlements.

**c.**

Regardless of whether Kestrel would have relied on Living Benefits' expertise, Living Benefits argues that there can be no common enterprise here because the origination agreement contemplated one-to-one transactions with a single investor. For this argument, Living Benefits relies primarily on the Supreme Court's decision in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), and this court's decision in *Youmans v. Simon*, 791 F.2d 341 (5th Cir. 1986). In *Marine Bank*, the Court held that the plaintiff did not enter into an investment contract by agreeing to provide collateral for the defendants' business loan in exchange for 50% of the business's net profits, $100 per month, use of the business's property, and veto rights over the business's future borrowing. 455 U.S. at 553. In two paragraphs of analysis, the Court held that the arrangement was not an investment contract because it was "not the type of instrument that comes to mind when the term 'security' is used." *Id.* at 559. In reaching this conclusion, the Court cited the one-on-one nature of the arrangement, the provisions giving the plaintiff use of the defendants' property, and the control the defendants gave the plaintiff over future borrowing. *See id.* at 560.

Seizing on *Marine Bank*'s language about the one-on-one nature of the transaction, Living Benefits argues that a common enterprise requires multiple investors. We have not read *Marine Bank* quite so restrictively. In

*Youmans*, this court cited *Marine Bank* for the proposition that "[a]greements negotiated one-on-one creating enterprises in which investors are actively involved, knowledgeable, and able to protect their interests are not within the ambit of the federal securities laws." 791 F.2d at 346. Accordingly, in that case, the court found a joint venture was not an investment contract when the investors exercised significant control over the venture and the promoters "possessed no unique ability that could not be replaced by the investors." *Id.* at 346-47. As already explained, the facts of this case are otherwise.

Moreover, in *Long*, we read *Marine Bank* as a "narrow holding that a *unique agreement*, negotiated on a one-on-one basis, is not a security." *Long*, 881 F.2d at 140 n.11 (emphasis added). We concluded this narrow holding did not abrogate our broad vertical commonality test. *Id.* And in denying rehearing in *Long*, we acknowledged that broad vertical commonality was subject to criticism specifically because it applied to transactions involving lone investors. *See Long v. Shultz Cattle Co., Inc.*, 896 F.2d 85, 86-87 (5th Cir. 1990) (per curiam). *Marine Bank* thus does not prevent a transaction involving a single investor from being an investment contract. To the extent Living Benefits asks this panel to depart from *Koscot*, the rule of orderliness prevents it from doing so. *See, e.g.*, *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016).

#### d.

Lastly, Living Benefits argues that transactions of nonfractionalized life settlements are not investment contracts, but it does not explain why this is so apart from noting that the nonfractionalized life settlements in this case distinguish it from *Mutual Benefits*. The *Life Partners* court speculated that there may be some distinction between fractionalized and nonfractionalized life settlements. 87 F.3d at 539. An SEC taskforce likewise noted that no court has ruled on nonfractionalized life settlements and expressed uncertainty about how a court would approach such a case. *See* Life Settlements Task

Force, Staff Report to the United States Securities and Exchange Commission 24 (2010).

We agree there is a distinction between fractionalized and nonfractionalized life settlements, but it is not one that changes the outcome of this case. Recall that the decisive fact under *Howey*'s second and third prongs (as interpreted by this circuit) is Kestrel's reliance on Living Benefits to appraise the life settlements and help Kestrel negotiate a favorable price. Kestrel's reliance on Living Benefits is unaffected by whether the life settlements are fractionalized. Although we do not speculate how our sister circuits would resolve the issue, there is an argument that nonfractionalized life settlements would not meet the horizontal commonality test applied in other circuits: the *Life Partners* court found horizontal commonality specifically because the investors relied on sales of the fractionalized remainder of the life settlement for the transfer to take effect. *See* 87 F.3d at 310. But this has no bearing on the broad vertical commonality test that we apply.

To summarize, the facts of this case show that if it had entered into the origination agreement, Kestrel would have invested money in life settlements, satisfying *Howey*'s first prong. In doing so, it would have relied on Living Benefits' substantial expertise and pre-purchase efforts to profit on its investments in life settlements, satisfying *Howey*'s second and third prongs. Accordingly, the life settlements contemplated in the origination agreement are investment contracts within the meaning of the IAA.

## III.

Under the engagement letter, Living Benefits promised to advise Kestrel about life settlements. Because the district court did not clearly err in finding that Living Benefits was in the business of rendering such advice, and because we conclude that the contemplated life settlements were investment contracts

within the meaning of the IAA, Living Benefits was required to register as an investment adviser. Having failed to do so, it cannot now collect the balance Kestrel owes it under the engagement letter. Accordingly, we AFFIRM the judgment of the district court.