[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
MAY 6, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14850

_____

D. C. Docket No. 04-60573-CV-FAM

SECURITIES & EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

MUTUAL BENEFITS CORP.,
JOEL STEINGER, a.k.a. Joel Steiner, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

( May 6, 2005 )

Before CARNES and COX, Circuit Judges, and MILLS[*], District Judge.

COX, Circuit Judge:

_____

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

In this interlocutory appeal, Defendants, Mutual Benefits Corp. ("MBC"), et al.,[1] appeal the decision of the district court denying their motion to dismiss for lack of subject matter jurisdiction. The district court denied the motion on the ground that investments in viatical settlement contracts are "investment contracts" within the meaning of the Securities Acts of 1933 and 1934. *Sec. Exch. Comm'n v. Mutual Benefits Corp.*, 323 F. Supp. 2d 1337 (S.D. Fla. 2004). We affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

The record reflects the following undisputed facts. MBC is a viatical settlement provider. A viatical settlement is a transaction in which a terminally ill insured sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value. Thus, in purchasing a viatical settlement, it is of paramount importance that an accurate determination be made of the insured's expected date of death. If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment.

---

[1] The other named defendants are either principals of MBC or "Relief Defendants," which the SEC alleges are shell corporations controlled by MBC or its principals.

Viatical settlement providers, like MBC, purchase policies from individual insureds and typically sell fractionalized interests in these policies to investors. Between 1994 and 2004, over 29,000 investors nationwide invested over $1 billion in viatical settlements offered by MBC. (R.4-193 at 2.) MBC identified terminally ill insureds, negotiated purchase prices, bid on policies, and obtained life expectancy evaluations. MBC recruited doctors to evaluate the health of an insured and produce a life-expectancy evaluation. MBC also created the legal documents needed to conclude all transactions. In order to sell viatical settlements to investors, MBC solicited funds from investors directly and through agents. Following the deposit of investor funds into escrow, MBC would pay premiums, monitor the health of the insureds, collect the benefits upon death, and distribute proceeds to investors.

Investors were asked to identify a desired maturity date and submit a purchase agreement on a form provided by MBC. The promised rate of return was dependent upon the term of the investment, which in turn was determined by the life expectancy evaluation. The actual rate of return, however, depended upon the date of the insured's death. If the insured lived beyond his life expectancy, the term of the investment was extended and the premiums had to be paid either from new investor funds assigned to other policies or by additional funds from the original investors. According to MBC, projected returns were substantial. MBC told investors that the

3

policy of a person with a life expectancy of 12 months would yield a 12% return, assuming the person died when expected; it told potential investors that the policy of a person with a life expectancy of 72 months would yield a 72% return. (R.4-160 Pl.'s Ex. 44 at 13.)

MBC touted to potential investors its expertise in evaluating life expectancy, and thus its ability to make the venture successful. Robert Roberts, a former in-house sales director at MBC, testified that investors were told about MBC's expertise in selecting policies and the track record it claimed in predicting life expectancy. (R.4-160 at 205-08, 213-20.) Roberts was instructed to inform inquiring investors that MBC correctly estimated life expectancy 80% of the time. (*Id*. at 213-20.) At no time did investors or potential investors have access to insureds' medical files. Thus, they could not, on their own, engage doctors to perform life expectancy evaluations. (*Id*. at 173-76.)

MBC made a profit by contracting for the right to purchase interests in life insurance policies and then selling those interests to investors at marked-up prices. A portion of the price paid by investors was set aside to pay premiums on the policy in question. MBC required investors to deposit the purchase price of the investment with an escrow agent before MBC selected a policy that fit the investment goals of

the individual investor based on the price the investor wanted to pay and the life-expectancy period that the investor desired.

MBC used several different purchase agreements, the specific terms of which varied depending on the investor's state of residence. One purchase agreement allowed an investor to withdraw his deposit for only three days after certain disclosures required by Florida law were made. (*Id*. Pl.'s Ex. 74 at 7.) Another allowed an investor to withdraw his deposit for only seven days after the date of deposit. (*Id*. Pl.'s Ex. 44 at 2.) After any such window closed, an investor had to accept one of the policies offered by MBC. As one of the purchase agreements stated:

> Purchaser may refuse any [] policy selection, but not rescind the Agreement, within five (5) business days following the date Purchaser receives that information [about the policy selection] from MBC. . . . If Purchaser validly rejects a proposed death benefit interest, MBC will attempt to locate and propose another such policy as soon as reasonably possible.[2]

(*Id*.)

While MBC was supposed to perform the life expectancy evaluation prior to closing on a settlement with an insured, (*see* R.4-139 at 119), MBC commonly did not send the information to the doctors retained by MBC for a life expectancy

---

[2] Another agreement form used in Florida allowed the investor to rescind the transaction within seven days after the closing. (R.4-160 Pl.'s Ex. 15 at 6.)

evaluation until after the closing. (*See* R.4-140 at 67.) There is evidence in the record that MBC, in fact, routinely did not receive life-expectancy evaluations until after closing. Melanie Goldberg was the person at MBC responsible for preparing the post-closing information to be sent to investors. She explained that she worked from a spreadsheet listing recently "closed" policies. (R.4-140 at 6, 16-18.) This "closed" list provided the insureds' names, their life expectancies, and the closing dates. (*Id*. at 17.) Goldberg routinely received medical records after a closing and sent them to one of the doctors used by MBC. (*Id*. at 17, 20-21.) Later, she got the medical reports back from the doctors and sent them to investors. (*Id*. at 21.) When drafting reports for doctors to sign, Goldberg testified that she (in accordance with MBC policy) entered the date MBC acquired a particular policy as the date of the medical report. (*Id*. at 54-55.) Doctors' reports were always pre-dated, she explained, because "it had to look like it was being reviewed at the time the viator was selling the policy . . . that it had to show that it was reviewed at the time the file was sold, not afterwards." (*Id*.)

After closing on a policy, MBC assumed certain responsibilities for paying premiums due. At least 1,000 policies were held in MBC's name for the benefit of thousands of investors who purchased fractionalized interests in those policies. (R.4-160 at 309-20.) Most of these agreements, purchased between 1995 and 1996, are

6

subject to an early version of the purchase agreement that required no further investment beyond the funds investors initially submitted. (*Id*.) Premiums on those policies were paid directly out of MBC's operating account. (*Id*.) The agreements other investors entered into with MBC set up a multi-level system for payment of premiums. At the first level, MBC would escrow sufficient funds to pay future premiums through the date of the estimated life expectancy of a given insured, or at the discretion of MBC, longer. (*Id*. Pl.'s Ex. 44 at 7.) MBC would then seek any available disability premium waiver from the applicable insurance company. (*Id*. Defs.' Ex. 49 at 2.) Next, MBC would establish a reserve from interest on escrowed funds and unused premiums "for payment of premiums on those policies with respect to which the insured outlives his/her projected life expectancy." (*Id*. Pl.'s Ex. 44 at 7.) MBC's affiliate, Viatical Services, Inc., would establish a "premium reserve to pay any unpaid premiums" if the reserve established by MBC and its trustee were exhausted. (*Id*.) Lastly, the investor would be responsible for his own pro rata share. (*Id*. Defs.' Ex. 49 at 2.) The record further reflects that MBC exercised discretion in the payment of premiums. For instance, money set aside for one set of policies was used to pay premiums for another set. (R.4-139 at 48, 75-77.) A total of $4.52 million was transferred from the escrow account set up for one set of policies to an

escrow account set up for another. (R.4-160 Pl.'s Ex. 3 at 1-2.) As a result, no investor was ever asked to pay additional premiums, despite escrow deficiencies.

The Securities and Exchange Commission ("SEC") filed this action seeking injunctive and other relief, alleging violations of various federal securities laws by Defendants. In its complaint, the SEC alleges that in raising money for its viatical settlement enterprise, MBC falsely represented to investors that its life expectancy figures had been produced by independent physicians, that 65 % of its outstanding life insurance policies were sold to investors using fraudulent life expectancy figures, and that approximately 90% of its policies had already passed their assigned life expectancy. According to the SEC's complaint, as a result of the failure of older policies to mature, shortfalls in escrowed premium funds forced MBC to establish a premium payment scheme similar to traditional "Ponzi" schemes.

The court entered a temporary restraining order, appointed a receiver, and set an evidentiary hearing on the SEC's motion for a preliminary injunction.[3] At the evidentiary hearing, the district court also heard evidence on the issue of whether the activities of MBC were subject to federal securities laws. That question turned on whether an investment in a viatical settlement constituted an "investment contract"

---

[3] The preliminary injunction, granted on February 16, 2005, is not at issue in this appeal, and neither is the appointment of a receiver.

under the Securities Acts of 1933 and 1934. The court concluded that these viatical settlement contracts met the test established in *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100 (1946), and thus qualified as "investment contracts" covered by the Acts. The district court certified its order for interlocutory appeal to this court pursuant to 28 U.S.C. § 1292(b), and we granted Defendants' petition for leave to appeal the order.

## II.  STANDARD OF REVIEW

Subject matter jurisdiction is a question of law that we review de novo. *Triggs v. John Crump Toyota*, 154 F.3d 1284, 1287 (11th Cir. 1998).

## III.  CONTENTIONS OF THE PARTIES

MBC contends that the district court erred in its conclusion that MBC's viatical settlement contracts qualify as "investment contracts" under the Securities Acts. MBC argues that we should adopt the reasoning of the court in *Securities & Exchange Commission v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), which concluded that viatical settlement contracts are not "investment contracts" because they depend entirely upon the mortality of the insured, rather than the post-purchase managerial or entrepreneurial efforts of the viatical settlement provider. The SEC contends that the district court correctly declined to adopt the *Life Partners*

framework, and that controlling Supreme Court precedent requires a broader definition of "investment contracts" than that adopted by the D.C. Circuit.

## IV. DISCUSSION

A.  The Procedural Posture of the Jurisdictional Challenge

This interlocutory appeal is before us on an order denying MBC's Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Ordinarily, the "test of federal jurisdiction is not whether the cause of action is one on which the claimant can recover.  Rather, the test is whether 'the cause of action alleged is so patently without merit as to justify . . . the court's dismissal for want of jurisdiction.'" *McGinnis v. Ingram Equip. Co.*, 918 F.2d 1491, 1494 (11th Cir. 1990) (en banc) (quoting *Dime Coal Co. v. Combs*, 796 F.2d 394, 396 (11th Cir. 1986)). And, where the challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, "the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case."  *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981); *see also McGinnis*, 918 F.2d at 1494.

Here, the Defendants' motion to dismiss for lack of subject matter jurisdiction directly challenged the merits of the SEC's case. Ordinarily, such an attack is best resolved through a Rule 56 motion for summary judgment or a Rule 12(b)(6) motion to dismiss for failure to state a claim, which of course is automatically converted into a Rule 56 motion if the court considers matters outside the pleadings. *See Williamson*, 645 F.2d at 412-13. As the *Williamson* court explained, "This provides an additional safeguard for the plaintiff, for, in addition to having all his allegations taken as true, the trial court cannot grant the motion unless there is no genuine issue of material fact. This protection is not, however, provided the plaintiff who faces dismissal for lack of subject matter jurisdiction." *Id*. at 412. When ruling on a 12(b)(1) motion, however, the court is not prevented from inquiring into *undisputed* facts. *See id*. at 413. A challenge to the court's subject matter jurisdiction can properly be resolved on undisputed facts, even if such a challenge involves a direct attack on the merits of plaintiff's claim.

We believe this is such a case. Although MBC's motion to dismiss for lack of subject matter jurisdiction goes to the heart of the SEC's case, the question whether MBC's viatical settlement contracts qualify as "investment contracts" under the Securities Acts can properly be answered on the undisputed facts presented by the

11

record in this case. Both parties agree that this is so. They invite us to resolve this dispute, and we accept their invitation.

B. The Securities Acts

The Securities Act of 1933 and the Securities Exchange Act of 1934 both define the term "security" as including the catch-all term "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). The phrase "investment contract" is not defined in either statute. In *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100 (1946), the Supreme Court provided a flexible test for determining whether a particular transaction qualified as an "investment contract." "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." 328 U.S. at 298-99, 66 S. Ct. at 1103. The Court stated that this approach "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promises of profits." 328 U.S. at 299, 66 S. Ct. at 1103.

In *Securities & Exchange Commission v. Edwards*, 540 U.S. 389, 124 S. Ct. 892 (2004), the Supreme Court reaffirmed the definition enunciated in *Howey*. The Court reiterated that "'Congress' purpose in enacting the securities laws was to

regulate *investments*, in whatever form they are made and by whatever name they are called.' To that end, it enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" 540 U.S. at 393, 124 S. Ct. at 896 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 110 S. Ct. 945 (1990)).

There is no genuine dispute here that there was (1) an investment of money, (2) in a common enterprise,[4] (3) involving an expectation of profits. The only real dispute concerns whether the investor's expectation of profits is based "solely on the efforts of the promoter or a third party." MBC, relying on *Securities & Exchange Commission v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996), argues that this element is "a necessarily forward-looking inquiry." *See* Appellants' Br. at 13. MBC asks that we make a distinction between a promoter's activities prior to his having use of an investor's money and his activities after he has use of the money. This distinction was indeed made in *Life Partners*, a case involving facts similar to those presented here.

---

[4] MBC makes a passing objection to the district court's conclusion that investment in viatical settlement contracts involved a "common enterprise." *See* Appellants' Br. at 26 n.11. That argument is meritless. The investment scheme here involved both horizontal commonality, in that investor money was typically pooled to invest in a viatical settlement and investors shared both the promise of profits and the risk of loss, *see Life Partners*, 87 F.3d at 543-44, and vertical commonality, in that any profits were tied to the efforts of the promoters. See *Sec. & Exch. Comm'n v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

13

[W]e cannot agree that the time of sale is an artificial dividing line. It is a legal construct but a significant one. If the investor's profits depend thereafter predominantly upon the promoter's efforts, then the investor may benefit from the disclosure and other requirements of the federal securities laws. But if the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished. . . .

We see here no "venture" associated with the ownership of an insurance contract from which one's profit depends entirely upon the mortality of the insured . . .

*Id*. at 547-48. Because no significant post-purchase activity took place here, MBC argues, the expectation of profits is not based "solely on the efforts of the promoter or a third party."

We decline to adopt the test established by the *Life Partners* court. We are not convinced that either *Howey* or *Edwards* require such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter. The rule set forth in *Howey* and reiterated in *Edwards* directs us to broadly apply the Security Acts of 1993 and 1994 to all "schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S. Ct. at 1103; *see also Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S. Ct. 548, 553 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the

Act[s], form should be disregarded for substance and the emphasis should be on economic reality.").

While it may be true that the "solely on the efforts of the promoter or a third party" prong of the *Howey* test is more easily satisfied by post-purchase activities, there is no basis for excluding pre-purchase managerial activities from the analysis. *See Life Partners*, 87 F.3d at 551 (Wald, J., dissenting). Significant pre-purchase managerial activities undertaken to insure the success of the investment may also satisfy *Howey*. *See id.* Indeed, investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied. Courts have found investment contracts where significant efforts included the pre-purchase exercise of expertise by promoters in selecting or negotiating the price of an asset in which investors would acquire an interest. *See Sec. & Exch. Comm'n v. Eurobond Exch., Ltd.*, 13 F.3d 1334 (9th Cir. 1994) (involving interests in foreign treasury bonds); *Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*, 756 F.2d 230 (2d Cir. 1985) (involving interests in certificate of deposit program); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027 (2d Cir. 1974) (involving investments in warehouse receipts for whiskey).

Furthermore, while the "solely on the efforts of the promoter or a third party" prong of the *Howey* test may not be met where an investment relies predominantly on market speculation,[5] that is not the case here. The investors' expectations of profits in this case relied heavily on the pre- and post-payment efforts of the promoters in making investments in viatical settlement contracts profitable. The investors selected the "term" of their investment, and submitted completed agreement forms and money. Thereafter, MBC selected the insurance policies in which the investors' money would be placed. MBC bid on policies and negotiated purchase prices with the insureds. MBC determined how much money would be placed in escrow to cover payment of future premiums. MBC undertook to evaluate the life expectancy of the insureds—evaluations critical to the success of the venture. If MBC underestimated the insureds' life expectancy, the chances increased that the investors would realize

---

[5] As Judge Wald pointed out in her *Life Partners* dissent,

[I]f the realization of profits depends significantly on the post-investment operation of market forces, pre-investment activities by a promoter would not satisfy *Howey*'s third prong. In such a situation, the realization of investor profits is fundamentally outside of the promoter's control and the investor's dependence on the promoter is more circumscribed.

87 F.3d at 552 (Wald, J., dissenting); *see also Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (holding that the *Howey* test was not met where "the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]"). When profits depend upon market forces, public information is available to investors by which they can independently evaluate the possible success of the investment. In the case before us, investors were far more dependent on the efforts and information provided by MBC than an investor relying on the open market to produce a profit.

less of a profit, or no profit at all. And, investors had no ability to assess the accuracy of representations being made by MBC or the accuracy of the life-expectancy evaluations. They could not, by reference to market trends, independently assess the prospective value of their investments in MBC's viatical settlement contracts. There were important post-purchase managerial efforts of MBC as well. Often, life-expectancy evaluations were not completed until after closing. And, after closing on a policy, MBC assumed the responsibility of making premium payments. Escrow payments were collectively managed in such a manner that investors were not required to pay additional premiums. Thus, investors relied on both the pre- and post-purchase management activities of MBC to maximize the profit potential of investing in viatical settlement contracts.

MBC thus offered what amounts to a classic investment contract. Investors were offered and sold an investment in a common enterprise in which they were promised profits that were dependent on the efforts of the promoters. This is true regardless of which specific MBC purchase agreement form is at issue. Whether the investors were offered a longer or shorter window in which to withdraw funds from escrow, whether the life-expectancy evaluation was actually performed before or after closing, and despite certain differences in how premiums were paid, all investors here relied on the pre- and post-purchase managerial efforts of MBC to make a profit on

17

the investment in viatical settlement contracts. The investors here relied on MBC to identify terminally ill insureds, negotiate purchase prices, pay premiums, and perform life expectancy evaluations critical to the success of the venture. The flexible test we are instructed to apply by *Howey* and *Edwards* covers these activities, qualifying MBC's viatical settlement contracts as "investment contracts" under the Securities Acts of 1933 and 1934.

## V. CONCLUSION

Because we conclude that these viatical settlement contracts qualify as "investment contracts" under the Securities Acts of 1933 and 1934, the district court properly denied MBC's motion to dismiss for lack of subject matter jurisdiction.

**AFFIRMED.**