[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13052

_____

ACHERON CAPITAL, LTD.,
in its capacity as investment manager,

Plaintiff-Appellant,

SECURITIES AND EXCHANGE COMMISSION, et al.,

Plaintiffs,

*versus*

BARRY MUKAMAL,
as Trustee of the Mutual Benefits Keep Policy Trust,

Interested Party-Appellee,

MUTUAL BENEFITS CORP., et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:04-cv-60573-FAM

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and ANDERSON, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal is the latest in a years-long postjudgment dispute about the disposition of fraudulently sold investments. The question presented is whether some combination of court orders and agreements permits the court-appointed trustee to sell the interests of Acheron Capital, Ltd., and its portfolio companies in those investments. Because the order that Acheron appeals is not a "final decision[]," 28 U.S.C. § 1291, and did not involve the refusal "to wind up [a] receivership[]," *id.* § 1292(a)(2), this Court lacks jurisdiction. So, we dismiss the appeal.

## I. BACKGROUND

Mutual Benefits Corporation sold fractional investment interests in viatical settlements. *Sec. & Exch. Comm'n v. Mut. Benefits Corp.* (*Mutual Benefits I*), 408 F.3d 737, 738 (11th Cir. 2005). "A viatical settlement is a transaction in which a terminally ill insured

sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value." *Id.* "The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchase price, adjusted for time value." *Id.*

In 2004, the Securities and Exchange Commission sued Mutual Benefits for "falsely represent[ing] to investors that its life expectancy figures"—"of paramount importance" for valuing the settlements—"had been produced by independent physicians." *Id.* at 738, 740. "The administration and management of these Mutual Benefits policies were put into receivership by the district court," and investors were given "the option of retaining their investments or directing the court-appointed receiver to sell their interests." *Sec. & Exch. Comm'n v. Mut. Benefits Corp.* (*Mutual Benefits II*), 810 F. App'x 770, 772 (11th Cir. 2020). The parties refer to the policies retained by investors as "Keep Policies."

Some investors in the Keep Policies did not pay their share of the premiums associated with their interests, leaving the policies at risk of lapse and the non-defaulting investors at risk of losing their investments. To prevent the lapse of the policies, Acheron Capital, Ltd., through its portfolio companies, began to purchase the fractional interests of defaulting investors from the receiver. *Id.* at 772.

In 2009, the district court approved the transfer and management of the Keep Policies—including some policies in which Acheron held fractional interests—from the receiver to a trustee, Barry

Mukamal. The trust agreement permitted the Trustee "to author-ize and direct the sale . . . of the Keep Policies" "[i]n the event that . . . continued servicing of the Keep Policies becomes unfeasible," "and to distribute the proceeds . . . in such manner as the Trustee determines to be appropriate."

Acheron continued to purchase the fractional interests of de-faulting investors, this time from the Trustee, *id.*, but it raised con-cerns about the Trustee's management of the trust. The parties en-tered into an agreement in 2015 to resolve those concerns. The 2015 Agreement provided that, in the event that the Trustee sells "the entire portfolio of policies owned by the Trust," "Acheron will have the right to bid upon any sale of a policy in which it has an interest and the right to top any bid submitted by another party."

A few years later, Acheron and the Trustee filed competing motions to wind down the trust and distribute its assets. Acheron proposed a transfer of the Keep Policies "to Acheron in exchange for Acheron agreeing to pay future [s]ervicing [f]ees for the [p]oli-cies." (Emphasis omitted.) And it promised not to "sell any [p]olicy in which a [n]on-Acheron [i]nvestor [held] an interest . . . without that investor's written consent." The Trustee proposed "the sale of . . . entire polic[ies]" because "[t]he Trustee owns and holds title to the policies and the [p]olicy [i]nvestors own beneficial ownership in the fractional interests of the policy." The district court granted the Trustee's motion and denied Acheron's motion.

In early 2021, the Trustee filed a status report about the wind-down. The report "anticipate[d] that the Trustee's sale of the

Keep Policies in connection with the Trust wind-down [would] occur by the fourth quarter of 2021." (Emphasis omitted.) It stated that "the liquidation of the Trust portfolio [was] expected to involve the sale of the whole Keep Policies owned by the Trust, . . . with the proceeds of such sale to be distributed in a fair and equitable manner to all holders of fractional interests in those policies." And it stated that "[t]he Trustee . . . intend[ed] to seek Court approval of the following steps in [the wind-down] process: . . . [1] approval of any 'stalking horse' purchase offer and bidding/ sale procedures; [2] approval of the sale after auction; and [3] approval of the proposed means of distributing the net sale proceeds."

After Acheron objected to this plan, the district court granted an oral motion by the Trustee "to treat the . . . [s]tatus [r]eport as a request for instructions" about whether "the Trustee [could] engage in a process to auction whole policies implicating Acheron's asserted rights." And it ordered briefing on that issue. Acheron argued that the agreements governing its purchase of the fractional interests from the receiver and Trustee prohibited the Trustee from selling those interests. And it argued that the 2015 Agreement "require[d] either: (i) a policy by policy sale; or (ii) if a portfolio sale, a . . . per policy price has to be determined by the buyer or the auctioning party . . . . Acheron can then have a last look on a policy [by] policy (not portfolio) basis."

The magistrate judge, in a report and recommendation adopted by the district court, disagreed. It reasoned that the purchase agreements expressly provided that they were subject to an

earlier court order empowering the district court to approve a future sale of the fractional interests. And it determined "that the 2015 Agreement d[id] not require the Trustee to sell or value the policies on a policy by policy basis when liquidating the Trust[;] nor is the Trustee required to provide Acheron with a right to a 'last look.'" The district court added that "Acheron retain[ed] rights to object to other aspects of the liquidation of the Trust as the Trustee makes those determinations and moves the Court for approval of those additional steps in the wind down process." Acheron timely appealed the Instructions Order.

We expedited the appeal and directed the parties to file supplemental briefs about our jurisdiction. We asked whether the Instructions Order was "immediately appealable under 28 U.S.C. § 1292(a)(2), under the collateral order doctrine or the doctrine of practical finality, or as a final order disposing of a discrete postjudgment proceeding." Acheron argued that "it d[id] not appear that section 1292(a)(2) would provide for interlocutory review," but that the order could be appealed under the other theories we mentioned and "under the marginal finality doctrine." The Trustee argued that we lack jurisdiction.

## II. STANDARD OF REVIEW

"We review *de novo* questions of our jurisdiction." *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019).

### III. DISCUSSION

"We have a threshold obligation to ensure that we have jurisdiction to hear an appeal, for 'without jurisdiction we cannot proceed at all in any cause.'" *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1227 (11th Cir. 2020) (alterations adopted) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)). "The potential bases for our jurisdiction are few and well defined." *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 828 (11th Cir. 2010). "Our jurisdiction is ordinarily limited to appeals from final decisions of the district courts." *Id.*; *see* 28 U.S.C. § 1291. "Additionally, we have jurisdiction to review certain interlocutory orders of the district courts," *Thomas*, 594 F.3d at 828, including "[i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property," 28 U.S.C. § 1292(a)(2).

We divide our discussion in two parts. We first explain why the Instructions Order is not a "final decision[]." *Id.* § 1291. Second, we explain that the Instructions Order is not an appealable interlocutory order either. *See id.* § 1292(a)(2).

### A. The Instructions Order Is Not a "Final Decision."

Section 1291 grants us jurisdiction over "appeals from all final decisions of the district courts . . . ." *Id.* § 1291. "A final decision is typically one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment." *Mayer v. Wall St. Equity Grp., Inc.*, 672 F.3d 1222, 1224 (11th Cir. 2012)

(internal quotation marks omitted). "[T]he statute's core"— and most obvious—"application is to rulings that terminate an action," such as final judgments, see *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409 (2015), but the statute also applies to "[p]ostjudgment decisions," *Mayer*, 672 F.3d at 1224.

Acheron argues that we have jurisdiction under section 1291 to review the Instructions Order. It grounds this argument on ordinary principles of finality, the collateral order doctrine, the doctrine of practical finality, and on the doctrine of marginal finality. We address and reject each theory of jurisdiction in turn.

### 1. The Instructions Order Is Not a "Final Decision" under Ordinary Principles of Finality.

"[I]n postjudgment proceedings, . . . the meaning of a 'final decision' is less [than] clear because the proceedings necessarily follow a final judgment," *id.* (internal quotation marks omitted), but our caselaw supplies a two-step approach to aid our inquiry. The first step is to "treat the postjudgment proceeding as a free-standing litigation, in effect treating the final judgment as the first rather than the last order in the case." *Id.* (internal quotation marks omitted). The second step is to ask whether the order "disposes of all the issues raised in the motion that initially sparked the postjudgment proceedings," and whether the order is "apparently the last order to be entered in the action." *Id.* (internal quotation marks omitted). If we answer both questions in the affirmative, we may exercise jurisdiction under section 1291. Put slightly differently, a postjudgment order is an appealable final decision if the order

"finally dispose[s] of the question . . . raised by the post-judgment motion," "and there are no pending proceedings raising related questions." 15B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3916 (rev. 2d ed. 2021).

We disposed of an earlier appeal in this litigation using this approach. There, the Trustee had filed a "Back-Up Motion" in the district court for permission to "engage a back-up servicer" for the trust. *Mutual Benefits II*, 810 F. App'x at 773. Acheron and the servicer objected on the ground that the proposal would violate their respective agreements with the Trustee, but the district court granted the motion without a hearing and "apparently . . . before [the] deadline to respond to the motion." *Id.* at 775. The "Back-Up Order," *id.*, directed the servicer "to cooperate with the back-up servicer by delivering and transferring all of the Trust's data to the Trust and/or the back-up servicer," *id.* at 772. On appeal, in an unpublished decision, "[w]e conclude[d] [that] the Back-Up Order was a final order under [section] 1291." *Id.* at 774. We acknowledged "that the Back-Up Order did not dispose of all issues raised in the receivership proceeding." *Id.* (internal quotation marks omitted). But because "[t]he Back-Up Motion raised discrete requests for postjudgment relief," we treated the motion as the start of "a 'free-standing litigation.'" *Id.* at 774–75 (quoting *Mayer*, 672 F.3d at 1224). And because "[t]he [Back-Up] Order dispos[ed] of those requests," and there were no "'closely related questions or proceedings [still] pending,'" the Back-Up Order was "an appealable final

[decision]." *Id.* at 774–75 (quoting 15B WRIGHT ET AL., *supra*, § 3916).

By contrast, we held in *Mayer v. Wall Street Equity Group, Inc.*, that we lacked jurisdiction under section 1291 to review the denial of the defendants' postjudgment motion for attorney's fees. 672 F.3d at 1224. We explained that the district court had yet to rule on the plaintiff's competing motion for fees, and it was that earlier motion that had "initiated the postjudgment proceedings." *Id.* So, the denial of the defendants' motion had not "dispose[d] of all the issues raised in the motion that initially sparked the postjudgment proceedings." *See id.* We also explained that we "would still [have] lack[ed] appellate jurisdiction" "[e]ven if the motions had been filed in reverse order" "because the other fee motion would [have] remain[ed] outstanding" and the denial would not have been "apparently the last order to be entered in the action." *Id.* (internal quotation marks omitted). And we added that, "[f]or us to hold otherwise invites litigants to appeal every attorney's fee order, even if other requests remain outstanding, resulting in a proliferation of piecemeal or repetitious appeals." *Id.* That result would have run afoul of Supreme Court precedent that "[t]he effect of [section] 1291 is to disallow appeal from any decision which is incomplete," and that the "purpose [of the section] is to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results." *Id.* (alterations adopted) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

The Instructions Order is not a final decision. The dispute over the Trustee's power to sell Keep Policies, including his power to sell whole policies, first arose when Acheron and the Trustee filed competing motions to wind down the trust and sell the Keep Policies. So, those motions were "the motion[s] that initially sparked the postjudgment proceedings" here. *Id.* The Instructions Order did not "dispose[] of all the issues raised in the [wind-down] motion[s]," *id.*, because the wind-down and sale process is still ongoing and the order explicitly preserved Acheron's "rights to object to other aspects of" that process. Indeed, Acheron has exercised those rights. For example, it has asked the district court to "allow policies . . . to be removed from the Trust" before the sale "at the request of 100% of the beneficial owners of such polic[ies]." And it has asked for an order directing the Trustee to ask other investors whether they wish to opt out of the Trustee's plan to sell their interests in the Keep Policies. These other requests related to the sale "remain outstanding," *id.*, preventing the Instructions Order from becoming final.

Nor is the Instructions Order "apparently the last order to be entered in the action." *Id.* (internal quotation marks omitted). Instead, the order itself contemplated that the Trustee would "move[] the [district] [c]ourt for approval of . . . additional steps in the wind down process." Those "additional steps" now include a pre-auction motion to approve the sale. Because the Instructions Order is, by its own terms, a mere "step[] towards" a sale order, "there may be no intrusion by appeal" until the district court enters

that order. *Cohen*, 337 U.S. at 546; *see also State St. Bank & Tr. Co. v. Brockrim, Inc.*, 87 F.3d 1487, 1489–90 (1st Cir. 1996) (holding that an order approving a sale of property was not final because the "final sale w[as] . . . contingent on a later determination of its necessity" and the district court "must hold a hearing and resolve potentially difficult and disputed issues, including . . . the actual amount that will be realized" "before the sale becomes binding"); 15B WRIGHT ET AL., *supra*, § 3915.2 ("Finality . . . may be defeated by the need to finish yet other tasks before execution is possible.").

Only after the district court approves the sale will there be a final decision. At that point, all disputes about the sale will be "concluded and closed," *Cohen*, 337 U.S. at 546, and the Instructions Order will be capable of immediate execution, *cf. Mutual Benefits II*, 810 F. App'x at 774–75 (permitting an appeal under section 1291 from an order that required immediate compliance by the appealing party). Acheron will then be entitled to appeal and "combine in one review all stages of the [wind-down] proceeding," including the Instructions Order. *Mayer*, 672 F.3d at 1224 (quoting *Cohen*, 337 U.S. at 546). The contrary conclusion—that the Instructions Order is a final decision—would "invite[] litigants to appeal every . . . order" leading up to a sale, "even if other requests remain outstanding, resulting in a proliferation of piecemeal or repetitious appeals." *Id.*

Acheron contends that the relevant proceeding began with the motion for an order of instructions, but that contention does not alter the outcome here. Before the district court ruled on the

motion for an order of instructions, other investors also challenged the Trustee's plan to sell their interests as inconsistent with the trust agreement. And these investors have asked the district court to "modify the Trust Agreement or the sale process . . . to mandate that the Trustee give all investors an option to keep their policies." This request remains pending in the district court, but, if granted, would likely moot the dispute between Acheron and the Trustee. Because "closely related questions or proceedings remain pending," the Instructions Order is not a final decision, however the relevant proceeding is defined. *Mutual Benefits II*, 810 F. App'x at 774 (quoting 15B WRIGHT ET AL., *supra*, § 3916).

### 2. The Collateral Order Doctrine Does Not Apply.

"The collateral order doctrine is best understood not as an exception to the 'final decision' rule laid down by Congress in [section] 1291, but as a practical construction of it." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (internal quotation marks omitted). For an order to be appealable under the doctrine, it "must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1278 (11th Cir. 2021) (en banc) (brackets in original) (internal quotation marks omitted). "[T]he conditions for collateral order appeal [are] stringent," and "the issue of appealability under [section] 1291 is to be determined for the entire category to which a claim belongs." *Digit. Equip. Corp.*, 511 U.S. at 868. "As long as the class of claims,

taken as a whole, can be adequately vindicated by other means, the chance that the litigation at hand might be speeded, or a particular injustice averted, does not provide a basis for jurisdiction under [section] 1291." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (alteration adopted) (internal quotation marks omitted).

The Instructions Order is not appealable under the collateral order doctrine. Acheron cannot satisfy the second requirement—that the order "resolve an important issue completely separate from the merits of the action," *SmileDirectClub*, 4 F.4th at 1278 (internal quotation marks omitted)—because the issue is not sufficiently important and the Instructions Order is not completely separate from the merits of the remaining post-judgment proceedings. And it cannot satisfy the third requirement because the Instructions Order may be effectively reviewed on appeal from the order approving the sale.

A party asserting that an issue is important for purposes of the collateral order doctrine faces a high bar. To ensure that the "class of immediately appealable prejudgment decisions" remains "small," *Digit. Equip. Corp.*, 511 U.S. at 878 (internal quotation marks omitted), the Supreme Court has held that an issue is not sufficiently important unless "delaying review until the entry of final judgment would imperil a substantial public interest or some particular value of a high order," *Mohawk*, 558 U.S. at 107 (internal quotation marks omitted). Values considered to be of a sufficiently high order have included "honoring the separation of powers, preserving the efficiency of government and the initiative of its

officials, respecting a State's dignitary interests, and mitigating the government's advantage over the individual." *Will v. Hallock*, 546 U.S. 345, 352–53 (2006).

But even those weighty interests are not always enough to warrant an immediate appeal. "We routinely require litigants to wait until after final judgment to vindicate valuable rights, including rights central to our adversarial system." *Mohawk*, 558 U.S. at 108–09. For example, we recently held that a state's interest in avoiding trial on a claim under the Sherman Act was not "a value of sufficiently high order" even though the interpretation of the Act on which the state relied was "based in part on federalism concerns." *SmileDirectClub*, 4 F.4th at 1283. Moreover, the Supreme Court has suggested that "privately conferred right[s]" are significantly less likely than policies "embodied in a constitutional or statutory provision" to "supply the basis of a collateral order appeal": "[I]t is one thing to say that the policy of [section] 1291 to avoid piecemeal litigation should be reconciled with policies embodied in other statutes or the Constitution, and quite another to suggest that this public policy may be trumped routinely by the expectations or clever drafting of private parties." *See Digit. Equip. Corp.*, 511 U.S. at 879–80.

Acheron cannot clear this high bar. To be sure, it is undoubtedly important to Acheron that its contracts are correctly interpreted and that its investments retain their full value. But the issue of importance turns "on the entire category to which a claim belongs," "not on the specific case under consideration."

*SmileDirectClub*, 4 F.4th at 1282 (internal quotation marks omitted). And although Acheron contends that "it is a matter of great public concern that freedom of contract be not lightly interfered with," *Banfield v. Louis*, 589 So. 2d 441, 446 (Fla. Dist. Ct. App. 1991) (internal quotation marks omitted), the freedom of contract "does not rise to the level of importance needed for recognition under [section] 1291," *Digit. Equip. Corp.*, 511 U.S. at 878; *cf. id.* at 866, 879–81 (concluding that an order rescinding a settlement agreement did not implicate a sufficiently important interest to warrant immediate appeal). If "the societal interests advanced by the ordinary operation of final[ity] . . . principles" could "be trumped routinely by the [contractual] expectations . . . of private parties," "the narrow exception" to those principles would "swallow the general rule." *Id.* at 868, 879–80 (internal quotation marks omitted). As the Supreme Court has "repeatedly stressed," we may not countenance such an outcome. *Id.* at 868; *see also Mohawk*, 558 U.S. at 113 ("[W]e reiterate that the class of collaterally appealable orders must remain narrow and selective in its membership." (internal quotation marks omitted)).

Another reason the Instructions Order cannot satisfy the second requirement is that it is not "completely separate from the merits of the action." *SmileDirectClub*, 4 F.4th at 1278 (internal quotation marks omitted). As mentioned earlier, in the context of postjudgment finality, "we treat the postjudgment proceeding as a free-standing litigation." *Mayer*, 672 F.3d at 1224 (alterations adopted) (internal quotation marks omitted). So, the relevant

21-13052                Opinion of the Court                17

"action" here is the postjudgment wind-down proceeding, not the underlying action brought by the Securities and Exchange Commission against Mutual Benefits. *See Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 997 (9th Cir. 2003) (considering whether the orders that were the subject of the appeal were "entirely separate from the post-judgment proceedings in which they were issued"). And, as explained above, the Instructions Order is not completely separate from the rest of the proceedings, but instead involves issues that "substantially overlap [with] factual and legal issues of the underlying [wind-down] dispute, making [the order] unsuited for immediate appeal as of right under [section] 1291." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988).

Nor is the Instructions Order effectively unreviewable on a later appeal, the third requirement for the doctrine to apply. Again, Acheron may seek review of the Instructions Order when it appeals the final approval of the sale. Acheron fears that "an appeal will be too late" at that point because the sale might occur before this Court can resolve the appeal, but this fear is unfounded. This Court may expedite the later appeal, as it did this appeal. And Acheron does not explain why an application—in this Court or in the district court—to stay an order approving the final sale would not sufficiently protect its interests. *See HSBC Bank USA, N.A. v. Townsend*, 793 F.3d 771, 780 (7th Cir. 2015) (concluding that there was "no need . . . to allow an immediate appeal" of a pre-sale order because "federal courts at every level have the authority to stay the effect of a judgment pending appeal"); *Morgan v. Roberts*, 702 F.2d

945, 947 (11th Cir. 1983) ("Appellants could have preserved the issue by applying for a stay until an appeal could be heard."); *S. Bell Tel. & Tel. Co. (S. Bell) v. United States*, 541 F.2d 1151, 1155 (5th Cir. 1976) (explaining "that full and effective appellate review of [an ephemeral] order will be possible prior to . . . [its] expiration," "provided timely steps are taken in the [d]istrict [c]ourt and in this Court" to obtain a stay). Indeed, the district court has already granted a stay of the Instructions Order "to the extent it allows the Trustee to sell Acheron Trusts' fractional interests in the Keep Policies." We have no reason to suppose that the district court would change its position and deny a stay after its approval of the sale.

To be clear, we express no view as to the merits of any stay application, and our holding does not turn on whether a later application for a stay is in fact granted. When determining whether a right is "effectively reviewable," we "focus . . . on the entire category to which a claim belongs," and "do not engage in an individualized jurisdictional inquiry." *Mohawk*, 558 U.S. at 107 (internal quotation marks omitted). Because the stay of a sale will ensure effective appellate review of pre-sale orders—the "category to which [Acheron's] claim belongs"—appeals under the collateral order doctrine are unavailable for "the entire category." *Id.* (internal quotation marks omitted).

3. The Doctrine of Practical Finality Does Not Apply.

Acheron next invokes the rule in *Forgay v. Conrad*, 47 U.S. (6 How.) 201 (1848), "another qualification of the traditional rule [of finality]," as the basis for the Court's jurisdiction. *Martin Bros.*

*Toolmakers, Inc. v. Indus. Dev. Bd.* (*In re Martin Bros. Toolmakers, Inc.*), 796 F.2d 1435, 1437 (11th Cir. 1986). The *Forgay* rule, also known as the "doctrine of practical finality," permits review of an order that "'decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be sold, or directs the defendant to pay a certain sum of money to the complainant.'" *Atl. Fed. Sav. & Loan Ass'n of Ft. Lauderdale v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 376 (11th Cir. 1989) (quoting *Forgay*, 47 U.S. (6 How.) at 204). To fall within the rule, the order must also "direct[] immediate" execution "and subject[] the losing party to irreparable harm if appellate review is delayed until conclusion of the case." *See In re Martin Bros.*, 796 F.2d at 1437 (internal quotation marks omitted).

The Instructions Order is not reviewable under the doctrine of practical finality. "The order did not *direct* the delivery [or sale] of property" or the payment of money, "but merely authorized" a disputed aspect of a future sale. *The Charter Co. v. The Prudential Ins. Co. of Am.* (*In re Charter Co.*), 778 F.2d 617, 622 (11th Cir. 1985); *see also Smith v. Seaside Lanes (In re Moody)*, 825 F.2d 81, 89 (5th Cir. 1987) ("*Forgay* differs from this case in that here no property has been ordered turned over to the trustee, or to anyone else."). Nor does this appeal satisfy the other requirements for the doctrine to apply. Execution of the sale will not be immediate but will require future approval. *See* 15A WRIGHT ET AL., *supra*, § 3910 ("Appeals [under the *Forgay* rule] are denied in easy cases, such as those that do not involve immediate execution."). And Acheron

will not be irreparably harmed if it has to wait until an appeal of the final approval of the sale—particularly if Acheron obtains a stay. See Barnard v. Gibson, 48 U.S. (7 How.) 650, 657–58 (1849) (holding that Forgay did not apply and that the defendants would not be irreparably harmed by a later appeal because "the Circuit Court ha[d][the] power to suspend[the order] or set it aside" pending review of the merits).

4. The Doctrine of Marginal Finality Does Not Apply.

We may readily dispose of Acheron's attempt to rely on the doctrine of marginal finality. In Gillespie v. United States Steel Corp., 379 U.S. 148, 153–54 (1964), the Supreme Court held "that even an order of marginal finality should be accorded immediate review if the question presented is fundamental to further conduct of the case," Atl. Fed., 890 F.2d at 376. But because "the indiscriminate allowance of appeals from [nonfinal] orders is plainly inconsistent" with section 1291, see Coopers & Lybrand v. Livesay, 437 U.S. 463, 477 n.30 (1978), "the Supreme Court has since limited th[e] [marginal finality] doctrine to the unique facts of Gillespie," United States v. Shalhoub, 855 F.3d 1255, 1262 (11th Cir. 2017) (alteration adopted) (internal quotation marks omitted). Gillespie concerned "an unsettled issue of national significance," Coopers & Lybrand, 437 U.S. at 477 n.30—"whether the Jones Act provided the exclusive remedy for the alleged wrongful death of a deceased seaman," Shalhoub, 855 F.3d at 1262. Those "unique facts" are not present here, id. (internal quotation marks omitted), so jurisdiction is not present either. "And we have explained that it is inconsistent

for a litigant to assert that we have appellate jurisdiction under the collateral order doctrine, which requires the issue resolved to be completely *separate* from the merits, *and* the marginal finality doctrine, which addresses the review of intermediate issues *fundamental* to the further conduct of the case." *Id.* (internal quotation marks omitted).

*B. We Do Not Have Jurisdiction under Section 1292(a)(2).*

Section 1292(a) grants "courts of appeals . . . jurisdiction of appeals from . . . [i]nterlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." 28 U.S.C. § 1292(a), (a)(2). As Acheron concedes, the Instructions Order was not an order appointing a receiver, refusing to wind up a receivership, or refusing to "take steps to accomplish the purposes" of the receivership. *See id.* § 1292(a)(2); *see also Netsphere, Inc. v. Baron*, 799 F.3d 327, 332 (5th Cir. 2015) ("[W]e interpret the verb phrase 'refusing orders' to modify both the infinitive phrase 'to wind up receiverships' and the infinitive phrase 'to take steps to accomplish.'"). So, if the plain meaning of the statutory text controls, we would not have jurisdiction under section 1292(a)(2).

"But we do not write on a blank slate." *Corley*, 965 F.3d at 1228. In *United States v. "A" Manufacturing Company*, our predecessor Court interpreted section 1292(a)(2) as "provid[ing] for appeals from interlocutory orders which take steps to accomplish the purpose of receiverships such as directing the sale or disposal of

property." 541 F.2d 504, 505–06 (5th Cir. 1976). And, in the light of that interpretation, the Court concluded that it had jurisdiction over an appeal from an order "which required the sale of assets and [an] order which confirmed the same." *See id.* at 505–06.

This panel is bound by the published decisions of the former Fifth Circuit, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), but, as the current Fifth Circuit has explained, *"A" Manufacturing* is in significant tension with even earlier decisions of our predecessor Court, *see Netsphere*, 799 F.3d at 334. For example, in *Wark v. Spinuzzi*, 376 F.2d 827 (5th Cir. 1967), our predecessor Court held that "an order of the [d]istrict [c]ourt requiring appellants to turn over certain bonds to [a] [r]eceiver" was not appealable under what is now section 1292(a)(2) because it did not fall within the kinds of orders enumerated in that section. *Id.* at 827. And in *Belleair Hotel Co. v. Mabry*, 109 F.2d 390 (5th Cir. 1940), the Court held that it did not have jurisdiction under "an earlier (but nearly identically phrased) version of section 1292(a)(2)," *Netsphere*, 799 F.3d at 334, to review an order authorizing the "receiver of the Bellevue-Griswold Hotel Company . . . to execute a lease . . . [upon] property in his possession belonging to said company," *Belleair Hotel*, 109 F.2d at 390. The Court explained that the order was not one "*refusing* to take appropriate steps to wind up a pending receivership." *Id.* at 391 (emphasis added).

"[W]e are obligated, if at all possible, to distill from apparently conflicting prior panel decisions a basis of reconciliation and to apply that reconciled rule." *Corley*, 965 F.3d at 1230 (internal

quotation marks omitted). "[I]f we cannot reconcile our precedent, we must follow the oldest decision that governs the issue." *Id.* The rule statement in *"A" Manufacturing* could be read as providing that section 1292(a)(2) permits review of *all* "interlocutory orders which take steps to accomplish the purpose of receiverships." *See "A" Manufacturing*, 541 F.2d at 505–06. If this statement forms part of the holding of the decision, *"A" Manufacturing* is irreconcilable with earlier precedent because our predecessor Court in *Wark* and *Belleair Hotel* held that it did not have jurisdiction over two such interlocutory orders. *See Netsphere*, 799 F.3d at 334. But if *"A" Manufacturing* is construed as holding only that section 1292(a)(2) permits review of orders "directing the sale . . . of property," *"A" Manufacturing*, 541 F.2d at 506, the decision could at least arguably be read as not entirely irreconcilable because neither *Wark* nor *Belleair* involved such an order.

We need not decide between reconciling *"A" Manufacturing* and affording the decision no precedential force at all because we lack jurisdiction to review the Instructions Order under either approach. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[A] common method for dealing with intracircuit conflicts is to recognize the split of authority and then proceed to determine whether the facts of the case at hand are such that resolution of the conflict is unnecessary to dispose of the case."). If *"A" Manufacturing* has no precedential value, we would lack jurisdiction because the order is not of the kind mentioned in section 1292(a)(2). And we would lack jurisdiction under a reconciled rule

because the order does not direct a receiver to sell receivership property. Either way, we lack jurisdiction.

## IV. CONCLUSION

We **DISMISS** the appeal for lack of jurisdiction.